785 So.2d 169 (2001)
Weta Happiness Joiner PATRICK, Plaintiff-Appellee,
v.
Christopher Wise PATRICK, Defendant-Appellant.
No. 34,799-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2001.
*170 D. Rex Anglin, Shreveport, George E. Lucas, Jr., Monroe, Counsel for Appellant.
T.J. Adkins, Rustin, Counsel for Appellee.
Before WILLIAMS, GASKINS and DREW, JJ.
GASKINS, J.
This appeal concerns custody of two children, an 11 year old boy and an eight-year-old girl. The father sought designation as domiciliary parent primarily due to the mother's marriage to a convicted felon. He appeals from the trial court's ruling that he failed to carry his burden of proof, as well as its order of an increase in child support. We affirm the portion of the judgment concerning custody. However, because we find the evidence pertaining to the parents' incomes insufficient, we remand the case to the trial court for further proceedings on the issue of child support.

FACTS
The parties, Weta Happiness Joiner Patrick and Christopher Wise Patrick, were married in 1985. Two children were born of this marriage: Clinton (DOB 6/16/89) and Krista (DOB 7/6/92). The parents divorced in November 1994, at which time they were awarded joint custody with the mother being the domiciliary parent and the father having visitation every other weekend, Tuesday and Thursday evenings, *171 and a portion of the holidays. As monthly child support, the father was required to pay the $678 house note, $280 in daycare expenses, and 100% of the children's uncovered medical and dental bills.
In 1996, following the mother's filing of a motion to modify custody and increase child support, a stipulated judgment modified the custody plan to eliminate the Tuesday visitation. The father received visitation on alternate weekends and Thursday evenings. At that time, the father's child support obligation was set at $950 per month, except for June and July when it was reduced to $475 per month. He was also required to continue paying the uninsured medical expenses, and school expenses were to be split between the parents.
Initially, the parents were cooperative and were able to implement the custody plan with little apparent rancor. However, when the mother's boyfriend, Roy Dowling, was arrested for stealing from his employer, the situation began to rapidly deteriorate. Mr. Dowling was an environmental safety director at Louisiana Tech University where the mother worked as an accounting technician in the payroll department. Legislative auditors discovered that Mr. Dowling had stolen university property including two computers. (Mr. Dowling gave one computer to his son from his first marriage. He donated the other to his church and took a deduction on his federal income taxes.) He was arrested for felony theft in October 1996 and fired by the university.
The father received a copy of a newspaper with an article about the theft from an anonymous source. He was also contacted by Mr. Dowling's former wife who alerted him to the possibility that the mother and Mr. Dowling were living together. Information the father gleaned from the children and private investigators led him to believe that Mr. Dowling was residing with the mother.
In February 1997, the father filed a motion to modify custody to name him as the domiciliary parent. In support, he alleged that the mother's relationship with Mr. Dowling was an inappropriate influence on the children. He also asserted that Clinton's grades had deteriorated, the mother was no longer taking the children to church regularly, and he could provide the children with a better home environment due to his remarriage in December 1995.
In March 1997, the mother and Mr. Dowling (hereinafter "the stepfather") married. That same month, the mother filed a rule seeking to modify visitation to eliminate the father's weekday visitation, to restrict his weekend and summer visitation, and to increase child support.
Trial on the rules was held on April 17, 1997; August 26, 1997; November 4, 17, and 18, 1998; December 3 and 18, 1998; and January 4, 1999.
During the lengthy period in which the rules were tried, the stepfather obtained a job in Shreveport. The mother then sought employment in the same area, securing a position at Centenary College. They moved with the children from Ruston to Shreveport. Additionally, the stepfather entered a plea of nolo contendere on the felony theft offense and was sentenced to six months of work release whereby he was allowed to work during the day but required to report to jail in the evening.
The father filed a supplemental rule in August 1998 alleging improper behavior by the stepfather toward the daughter, i.e., licking her face and arm; and abuse by the stepfather of his infant child from a prior marriage. The father also submitted psychological evaluations of the children by Dr. Bobby L. Stephenson which corroborated *172 the father's assertion that the children wanted to live with him. The boy also recounted to Dr. Stephenson that the stepfather had thrown him on a dresser. The trial court signed a temporary restraining order prohibiting the stepfather from being in the presence of the children. The court also ordered psychological evaluations of the parents, their spouses, and the children. In another supplemental rule filed in October 1998, the father alleged that the son had been consistently ill in his mother's custody, possibly due to an allergy to the mother's cats.
In August 1999, the court issued written reasons, denying the change of custody on the basis that the father had not carried his burden of proof. The court accepted testimony that, despite his felony theft conviction, the stepfather was a "good person." The court further found no "conclusive evidence" of the stepfather's alleged physical abuse of the son. Instead, the court found that the mother was good and caring; it also found no evidence that she had participated in or condoned the stepfather's complained of behavior. However, the court found that modification of the father's visitation was warranted to increase his time with the children, especially since the move to Shreveport had curtailed his weekday visits with them. The father was given custody of the children during the three summer months subject to the mother having alternate weekend visitation and two separate one-week vacation periods. As to child support, the court ordered an increase and directed the lawyers to calculate child support according to the child support worksheet, using an average of the parents' incomes for 1996 to 1998.
Judgment was signed in March 2000. In the judgment, child support was set at $1,444.23 per month, except for the summer months when it was reduced by half. The attached worksheet gave the mother's monthly gross income as $1,934.84 and the father's as $7,455.22.
The father filed a motion for new trial or alternatively a request to receive additional evidence. He alleged that the stepfather's unstable and abusive behavior had escalated and had been directed at Clinton, the mother and the stepfather's former wife. Among other things, the stepfather had allegedly threatened to hurt Clinton "real, real bad" if he told his father about the stepfather's abuse. Also, since the conclusion of trial, the mother was alleged to have reneged on her promise to keep the cats out of the house to the detriment of the children's health. Furthermore, the mother had allegedly slapped Clinton so hard she knocked the child to the ground. She also had supposedly backed out of an agreement to trade visitation, and the father had been repeatedly unable to contact the children. The father requested that the trial court set monthly child support according to his fixed salary with another support check based upon his actual bonus. The trial court summarily denied the motion.
The father appealed. He contends that the trial court erred in not awarding domiciliary custody of the children to him. Additionally, he asserts that the court erred in its award of increased child support.

CHILD CUSTODY

Law
If no considered decree has been rendered, the party seeking to modify the custody arrangement is required to prove that a change of circumstances materially affecting the welfare of the child has occurred since the original custody decree and that the proposed modification is in the best interest of the child. Evans v. *173 Lites, 30,362 (La.App.2d Cir.6/24/98), 714 So.2d 914.
In a child custody case, the determination of the trial judge will not be disturbed absent a clear showing of abuse of discretion. Draper v. Draper, 556 So.2d 210 (La.App. 2d Cir.1990); Wyatt v. White, 626 So.2d 816 (La.App. 2d Cir.1993). An appellate court is required to extend great weight to the factual conclusions of trial courts which are based on reasonable evaluations of credibility and reasonable inferences of fact. Rosell v. ESCO, 549 So.2d 840 (La.1989).

Discussion
Both parents have remarried and live in large, spacious homes in suitable neighborhoods. Both are very active in their respective Baptist churches. The father has a flourishing career as an engineer. The mother, the primary care-giver of both children for their entire lives, has voluntarily reduced her employment as a college payroll and benefits supervisor to part-time to be more available for the children. Both stepparents are employed. The father has a stepdaughter who is about two years older than Clinton and who lives with him and his present wife. He also has a biological daughter from his current marriage who is about three years old. The mother has a teenage stepson who occasionally visits but generally resides with his own mother; the status of another, non-biological child from the stepfather's first marriage is unclear.
We note at the outset that it is evident from the record that both parents love their children and are deeply concerned with their well-being. Furthermore, the evidence amply demonstrates that the children love both parents and wish to maintain a very close and loving relationship with each of them. Regrettably, the record also shows that the children are confused and torn by the frequent strife between the parents and that these protracted custody proceedings have been stressful for them.
The trial court noted with concern the resentment and lack of cooperation between the parents. Despite their mutual love for their children, both parents have periodically displayed poor judgment. Most of these unfortunate acts involve spiteful and petty behavior directed at the other parent and carried out with little or no regard as to their impact upon the children. According to the children, each parent has made negative comments about the other in their presence. The father's telephone communication with the children has been repeatedly compromised. At one point, the trial court suggested that the parents tape the conversations between themselves to ensure civility. The mother and stepfather "misunderstood" the suggestion as giving them free rein to tape, play back and even transcribe the children's conversation with their father. (Upon learning of these actions, the trial court clarified that it never intended for the children's calls to be recorded and that it considered this practice to be detrimental to the children's relationship with the father.) For his part, the father did not inform the mother of his remarriage, a circumstance which would undoubtedly impact the children; she learned of this event from Clinton about one month after the wedding. He also returned presents given by the children to the daughter born of his present marriage for no better reason than that were purchased by the mother. We share the trial court's concern about this ongoing rancor between the parents and its potentially devastating effect upon these young children.
The father's concerns pertaining to the welfare of his children are certainly understandable. Despite testimony from his *174 family and friends that he is a "good" person, the fact remains that the stepfather is a convicted felon, a circumstance casting serious doubt upon his moral character and suitability as a role model. Evidence was presented at trial demonstrating that, while still employed at Tech, the stepfather engaged in inappropriate behavior with student workers under his supervision. Due to the stepfather's proximity to the young daughter of the parties, the father found this conduct alarming. The children have reported to their father that the stepfather has been verbally and physically abusive to them.[1] According to the children, Clinton in particular, the stepfatheran adult male in his mid 30's who weighs in excess of 300 poundshas grabbed and jerked them by the arm; he also screams and yells at them.
The psychological evaluations performed on the parents and stepparents indicated that both women were good mothers with adequate coping skills. The results on the father indicated that he was "extremely self-centered." The stepfather had the worst results; they indicated that he had poor coping abilities and questionable self-control. The psychologist opined that the children should be left with the mother unless the preponderance of the evidence demonstrated that the stepfather was a threat to the children.
The trial court made a factual finding that there was "no conclusive evidence of any physical abuse to Clinton." Our review of the record tends to generally support this finding. In particular, an incident involving the stepfather forcibly setting the boy on a dresser in order to make the sleepy child get ready for school was extensively litigated. While the stepfather's actions showed questionable judgment, it appears that the incident was more harmful to the child's feelings than to his physical well-being.[2]
Applying the rules of appellate review, we find that the trial court was not clearly wrong in maintaining the mother as domiciliary parent. Although evidence was presented concerning problems with the stepfather, the mother's care of the children since birth has, on the whole, been adequate. The father himself stated that he could not say she was a "bad" mother. Academically, the children are doing well, making excellent grades in school. Several witnesses found to be credible by the trial court testified that the children seemed well-adjusted and happy. Therefore, as an appellate court, we are unable to find manifest error. Furthermore, we fully agree with the trial court's corresponding decision to give the father additional visitation in order to allow the children to maintain their close and loving relationship with him. This is particularly appropriate given the mother's unilateral decision to move the children from Ruston to Shreveport, an action which prevents the father, who lives in Monroe, from exercising his previously enjoyed weekday visitation.
*175 The portion of the judgment allowing the mother to continue as domiciliary parent is affirmed.

CHILD SUPPORT

Law
LSA-R.S. 9:315(4)(a) provides in pertinent part:
(4) "Gross income" means:
(a) The income from any source, including but not limited to salaries, wages, commissions, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, worker's compensation benefits, unemployment insurance benefits, disability insurance benefits....
It is entirely within the trial court's discretion to include a bonus payment in determining gross income. Zatzkis v. Zatzkis, 632 So.2d 307 (La.App. 4th Cir.1993), writs denied, 94-0157 (La.6/24/94), 640 So.2d 1340 and 94-0993 (La.6/24/94), 640 So.2d 1341; Bullock v. Bullock, 98-0263 (La.App. 4th Cir.8/19/98), 719 So.2d 113.

Evidence
The record demonstrates that in 1996, the father earned $92,922.29, of which $48,695.87 was a bonus. In 1997, the father earned $73,273.82. As of the end of October 1998, the father had a documented gross income of $40,630.06. According to the father's testimony, his current base salary is $50,000. Bonuses are given at the end of the year; they are based upon company productivity and are a purely discretionary decision by his employer.
The mother testified that while employed at Louisiana Tech, she earned an annual salary of about $24,500. According to her August 1997 testimony, she was earning $28,000 as an employee at Centenary College. In December 1998, she testified that her monthly gross salary at Centenary was $2,479.17. The mother later testified that effective January 1999, she was voluntarily reducing her employment to part-time.
In its August 1999 opinion, the trial court directed that, for child support purposes, the father's gross income would be determined by averaging his income for 1996 through 1998. The court directed that his 1998 income should be determined according to his W-2 form. As to the mother, the court directed that the income listed on her W-2 forms for 1996 through 1998 be averaged. However, the record does not contain the father's 1998 W-2 form or any of the mother's W-2 forms.
In March 2000, the court filed a "obligation worksheet-findings of fact" document which gave the father's gross monthly income as $7,455.22 and the mother as $1,934.84. The court then set the father's monthly child support obligation at $1,444.23.
At a hearing on March 2, 2000, the trial court noted that the attorneys for both parties had agreed to the judgment in form only and acknowledged that there was no agreement as to its substance. The only agreement as to child support pertained to arrearages.

Discussion
The father concedes that under La. R.S. 9:315(4)(a), inclusion of his bonuses is permissible in computing child support. However, he contends that, given the highly speculative nature of his end-of-year, lump-sum bonus, its inclusion is unfair as it forces him to give almost half of his monthly paycheck in child support. He requests that child support paid throughout the year be calculated upon his base salary with a supplemental child support payment being made based upon the actual amount of his annual bonus.
*176 We recognize the potential problems presented when a large year-end bonus, which is sometimes almost equal to the annual base salary, is included in the calculation of the parent's income for purposes of setting the monthly child support amount. However, the jurisprudence has given the trial court considerable discretion as to the handling of bonuses in child support calculation. In some cases, the courts have found it appropriate to include a parent's discretionary bonus as part of his income.[3] In other cases, a certain percentage of the parent's bonus has been designated as part of his child support obligation.[4] A trial court may even make adjustments in the calculation of a parent's gross income by not adding in a significant portion of a yearly bonus if it feels the facts warrant such action.[5] Accordingly, given the trial court's great discretion, we cannot say that the trial court abused its discretion in including the amount.
However, we find that the record does not properly document and support the child support amount awarded by the trial court. First, without the father's 1998 W-2 form, we cannot verify the accuracy of the amount assigned as his monthly gross income. Second, the mother's W-2 forms are not in the appellate record. From the testimony, we cannot determine her exact income for the years 1996, 1997 and 1998. (We note that she was a full-time employee during this time period and did not become "voluntarily underemployed" for child support purposes until January 1999.) However, the amount given for her averaged gross monthly income of $1,934.84 appears to be somewhat low, particularly in light of the mother's testimony of her increased salary at Centenary.
In those cases where the record contains inadequate information upon which to make a child support determination under the guidelines, a remand to the trial court is necessary. State v. Flintroy, 599 So.2d 331 (La.App. 2d Cir.1992). Inasmuch as the record in the present case is deficient on the issue of the parents' incomes, we remand the matter to the trial court for further proceedings on the issue of child support. On remand, the trial court may consider the most recent information available pertaining to the incomes of the parents. This includes information concerning the father's bonuses, under La. R.S. 9:315(4)(a), and the mother's voluntary underemployment, under La. R.S. 9:315.9.

CONCLUSION
The judgment of the trial court is affirmed as to custody. However, as to child support, the matter is remanded back to the trial court for further proceedings in accordance with this opinion. Costs are divided equally between the parties.
AFFIRMED IN PART; REMANDED.
NOTES
[1] Additionally, Clinton reported to the pastor of his father's church, who was also the father of one of his friends, that the stepfather was "mean" to him and had shoved him on more than one occasion and that he was afraid of the stepfather.
[2] However, we observe with concern that the father's motion for new trial alleges several disturbing incidents concerning threats and domestic violence, as well as frustration of the father's communications with the children. Should the mother fail to comply with any provisions of the joint custody agreement including the communication provisions, the father has adequate remedy through contempt proceedings. We also note that the terms of the joint custody plan expressly prohibit the stepparents from physically "disciplining" the children.
[3] Bullock v. Bullock, supra; Buchert v. Buchert, 93-1819 (La.App. 1st Cir.8/26/94), 642 So.2d 300.
[4] Wascom v. Wascom, 97-0547 (La.App. 1st Cir.6/29/98), 713 So.2d 1271, writ denied, 98-2028 (La.11/6/98), 728 So.2d 391.
[5] Caro v. Caro, 95-0173 (La.App. 1st Cir.10/6/95), 671 So.2d 516.