812 So.2d 854 (2002)
Katherine G. BAGWELL, Plaintiff-Appellee,
v.
S. Curry BAGWELL, Defendant-Appellant.
No. 35,728-CA.
Court of Appeal of Louisiana, Second Circuit.
March 8, 2002.
*856 Albert E. Loomis, III, Monroe, for Appellant.
Laurie Burkett, Robert P. Mcleod, Monroe, for Appellee.
*857 Before BROWN, CARAWAY and PEATROSS, JJ.
BROWN, J.
Plaintiff, Katherine G. Bagwell ("Kay"), and defendant, S. Curry Bagwell ("Curry"), were married on December 2, 1977, and divorced on December 20, 1999. During their 21½ year marriage, three children were born. At the time of the couple's divorce, however, two of the children had reached the age of majority and their youngest son, Christopher, was nine years old. Curry operated the Super Lube of Monroe, Inc., a business that performed oil changes and provided inspection stickers. Kay worked as a teacher's aide at St. Paul's Day School on a part-time basis. The record establishes that the Bagwells enjoyed a rather high standard of living, with their monthly expenses averaging somewhere in the neighborhood of $7,000. In addition to income generated from Super Lube, Curry had substantial earnings from his gambling activities, income from a trust managed by his brother and dividends from stock holdings. Further, the couple's extravagant lifestyle was in large part subsidized by Curry's wealthy parents.[1]
The parties agreed to a joint custody plan which named Kay as domiciliary parent and set forth Curry's visitation rights. A lengthy trial on the issues of child and spousal support was held over the course of several months and the trial court's judgment was signed on April 12, 2001. The court confirmed the parties' agreed-upon joint custody plan and awarded Kay child support in the amount of $1,056 per month and interim spousal support in the amount of $2,500 per month from the date of judicial demand, June 16, 1999, until 180 days after the divorce judgment. Curry was also ordered to pay 97% of the minor child's health insurance premium, as well as 97% of all uncovered medical, dental, prescription and orthodontic expenses.
It is from this judgment that Curry has appealed, contending that the trial court erred in its calculation of his monthly income for purposes of child and interim spousal support and in failing to find that Kay was underemployed for purposes of calculating her proportionate share of the parties' basic child support obligation.

Discussion

Applicable Legal PrinciplesChild Support
La.C.C. art. 227 provides that parents, by the very act of marrying, contract together the obligation of supporting, maintaining and educating their children. The obligation to support their children is conjoint upon the parents and each must contribute in proportion to his or her resources. Stogner v. Stogner, 98-3044 (La.07/07/99), 739 So.2d 762; Hogan v. Hogan, 549 So.2d 267 (La.1989); Harper v. Harper, 33,452 (La.App.2d Cir.06/21/00), 764 So.2d 1186. The overriding factor in determining the amount of support is the best interest of the children. State v. Baxter, 33,188 (La.App.2d Cir.05/10/00), 759 So.2d 1079; Baggett v. Baggett, 96-453 (La.App.3d Cir.04/23/97), 693 So.2d 264.
The Louisiana Child Support Guidelines set forth the method for implementation of the parental obligation to pay child support. La. R.S. 9:315, et seq.; Stogner, supra; State in the Interest of Travers, 28,022 (La.App.2d Cir.12/06/95), 665 So.2d 625. The guidelines are intended to fairly apportion between the parents the mutual financial obligation they owe their children in an efficient, consistent *858 and adequate manner. Id. Child support is to be granted in proportion to the needs of the children and the ability of the parents to provide support. La.C.C. art. 141.
Before their revision in 2001, the child support guidelines provided a schedule of parents' combined adjusted monthly gross income up to $10,000 upon which to base the monthly child support amount.[2] If the combined adjusted gross income of the parents, however, exceeds the highest sum on the schedule, the court has the discretion in setting the basic child support obligation. La.R.S. 9:315.10(B) (2000);[3]Porter v. Porter, 35,301 (La.App.2d Cir.12/19/01), 803 So.2d 399; State v. Baxter, supra; Hansel v. Hansel, 00-1914 (La. App. 4th Cir. 11/21/01), 802 So.2d 875. As noted by this court in State v. Baxter, supra at 1081, the amount of support should be judged on a case-by-case basis; there is no mathematical formula. A parent's ability to pay and the lifestyle that the child would have enjoyed had the parents not separated are important considerations. Id.
The trial court must consider the totality of the circumstances of each case in rendering an award of child support. Id. Since the trial court must use its discretion in setting the amount of child support based upon the facts before it, an appellate court is not to disturb the trial court's factual findings absent an abuse of its discretion or manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989); Porter, supra; State v. Baxter, supra.

Calculation of Curry's Gross Monthly Income
After finding that the evidence clearly showed that Curry was obligated to pay both child and spousal support, the trial court observed that the difficult part of this case was the determination of Curry's monthly income. The court identified the following sources of income available to Curry: financial contributions and benefits provided by his parents;[4] income from gambling; income derived from his oil change/inspection sticker business; and income from a family trust.[5]
*859 Gross income is defined by La.R.S. 9:315(4) (2000)[6] as:
(a) The income from any source, including but not limited to salaries, wages, commissions, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits, unemployment insurance benefits, disability insurance benefits,...
(b) Expense reimbursement or in-kind payments received by a parent in the course of employment, self-employment or operation of a business, if the reimbursements or payments are significant and reduce the parent's personal living expenses. Such payments include but are not limited to a company car, free housing or reimbursed meals; and
(c) Gross receipts minus ordinary and necessary expenses required to produce income, for purposes of income from self-employment, rent, royalties, proprietorship of a business or joint ownership or a partnership or closely held corporation....
In its written reasons for judgment, the trial court made the following factual findings, the bulk of which were based upon the court's credibility determinations, before turning to the calculation of Curry's monthly gross income:
Curry had several sources of income. He was a professional gambler and, by his own account and by other competent evidence, he was a fairly successful one. For several years, Mr. Bagwell also operated (and now owns) Super Lube in Monroe, Louisiana. He received substantial financial help from his own parents, which help was entangled with his employment duties to them, i.e., managing some of their properties and Mr. Bagwell had some income from a Trust administered by his brother.
The trial showed that Mr. Bagwell dealt extensively in cash. He had very few banking account and credit card records and kept very incomplete records of his own. Many of his personal expenses were paid out of the cash register and the checking account[s] associated with his business, Super Lube. The only direct objective evidence of his gambling winnings consisted of Federal Income Tax withholding forms generated by various gambling establishments in conformity with Federal Income Tax law. And, the evidence and Mr. Bagwell's own testimony showed, Mr. Bagwell's parents paid substantial living expenses for the Bagwells over the course of their 21½ year marriage. Kay had no substantial employment during the existence of their marriage, at least when compared to Curry's....
Much of the resolution of this case revolves around the credibility of Curry Bagwell in how he characterizes some of the financial transactions involving his parents and in his recapitulation of his gambling earnings. As the trial progressed, Curry's credibility was hurt significantly by some deceptive and sharp practices that he engaged in to conceal assets and income from Kay. As such, his own testimony about his income, while understandably self-serving, is not entitled to substantial weight.[7] *860 Curry was evasive in disclosing information and evidence about his gambling earnings and much of the evidence adduced at trial which tended to establish Curry's gambling earnings was uncovered only as a result of Kay's subpoenas served on gambling establishments that Curry was known to frequent. His own parents' participation in some of the financial transactions that were designed to shield or hide his income from [Kay] makes their own characterization of those transactions suspect. These included a number of transactions in which Curry attempted to retroactively characterize past income receipts as "loans" which necessitated payback to his parents.
The court then analyzed each source of income and we will do likewise.

(1) Gambling Income Attributable to Curry
Beginning with the premise that gambling is contra bonos mores in Louisiana, Curry contends that the trial court committed errors both of fact and of law in assigning to him monthly earnings of $8,000 from gambling for purposes of calculating child and interim spousal support. To Curry, it is untenable that the trial court expects him to participate in illegal wagering in order to produce an income upon which to base child and/or spousal support. Furthermore, any future income from gambling is purely speculative and therefore not reliable upon which to base a support obligation.
The child support guidelines define gross income as the income from any source. La.R.S. 9:315(4)(a) (2000). In addition to this general definition, the statute goes on to provide a lengthy, non-exclusive listing of the kinds of items included in the definition of "gross income" such as salaries, wages, commissions, bonuses, dividends, severance pay, pensions, interest, trust income, annuities and capital gains. Id.; Green v. Scott, 29,197 (La.App.2d Cir.01/22/97), 687 So.2d 655.
In Green, supra, the custodial mother sought an increase in child support after the father won a $1,177,065.01 Louisiana Megabucks jackpot. Rather than a lump sum, the father opted to receive 20 annual payments of $58,853.25.[8] The father objected, arguing that the lottery proceeds were not gross income for purposes of calculating child support. The juvenile court determined that the lottery proceeds should be included in the calculation of gross income and found that the mother was entitled to an increase in child support.
This court affirmed the judgment of the lower court, holding:
[W]e believe that the nature of this lottery "prize" should be considered in comparison to the nonexclusive listing of other income set forth in [La.R.S. 9:315(4)(a)]. The legislature, in our opinion, did not intend to exclude any items that might be considered in the broad category of prizes if such items have characteristics similar to the other sources of funds or assets listed in the statute.
When reviewed in comparison to the items listed in La.R.S. 9:315(4)(a), and in particular, trust income, annuities, severance pay and capital gains, we find the appellant's annual lottery proceeds must be considered as "gross income" even *861 though they represent an unearned flow of funds and are in the nature of a prize. This annual flow of funds clearly increases appellant's standard of living and improves his financial ability to provide for his son in the same way that a large and unexpected capital gain or severance pay award can cause an increase in one's wealth.
Further bolstering our decision is the fact that lottery proceeds are subject to Louisiana and federal income tax. Moreover, our legislature has provided for the withholding of lottery prizes of persons who have outstanding child support arrearages. It would be somewhat anomalous to hold that lottery proceeds are subject to income taxes and garnishment to pay child support arrearages, yet they are not gross income for the purposes of calculating an initial child support award or an increase to a former award.
Green, supra at 658.
While we were unable to find any Louisiana jurisprudence specifically holding that gambling winnings are includable in the calculation of monthly income for purposes of child support, there are several cases from other states which have so held.
In McWhorter v. McWhorter, 346 Ark. 475, 58 S.W.3d 840 (2001), the Arkansas Supreme Court held that gambling winnings were includable in the father's income for child support purposes. In McWhorter, as in the instant case, the father claimed that gambling winnings are not income because they are so uncertain and noncontinuous that such income cannot be considered as a dependable basis for establishing child support.
Interpreting the Arkansas Family Law Code's definition of "income," Ark.Code Ann. § 9-14-201(4)(A) (Supp.2001), which is very similar to the definition set forth in the Louisiana Child Support Guidelines, the Arkansas court emphasized that the term "income" is broadly construed for purposes of calculating the proper amount of child support. McWhorter, 346 Ark. at 482, 58 S.W.3d at 844. The court also noted that gambling winnings are included by the Internal Revenue Code as part of a person's gross income for federal income tax purposes. Thus, the court affirmed the lower tribunal's inclusion of gambling winnings (as offset by proven gambling losses) as income for purposes of determining child support. Id., 346 Ark. at 483, 58 S.W.3d at 845 (citations omitted). See also In re Marriage of Scheppers (2001), 86 Cal.App.4th 646, 103 Cal.Rptr.2d 529; Darden v. Darden, 66 N.C.App. 432, 311 S.E.2d 600 (1984).
Following the clear mandate of the child support guidelines that classification of income from any source is to be included in gross income for calculation of the child support obligation and utilizing the reasoning set forth by this court in Green, supra, we, like the trial court, find that gambling winnings (as offset by proven gambling losses) are properly characterized as gross income for child support purposes.
As to the amount set by the trial court, $8,000 per month, we once again must look to the court's factual findings:
Curry is a professional gambler of some modest repute. Defendant disputes the "professional" status but it is clear from the evidence that Curry's gambling activities far exceeded that which might reasonably be termed "casual." It was also clear from the evidence that Curry took substantial time off from the family's Super Lube business to tend to gambling enterprises. Since Curry kept no records of his gambling income and his testimony as to his gambling income was both vague and inconsistent, the *862 most reliable direct evidence of those earnings consisted of:
a. Curry's own income tax declarations for the years in question.
b. Federal withholding statements generated by gambling establishments after a substantial win by Curry.
c. Curry's own admissions.
Counsel for Curry argues in brief that Curry's gambling income should not be considered at all since Curry is an "addict" and such an addiction is a weak foundation upon which to base any prospective support. Such arguments are unpersuasive. Curry, as of the date of trial of his case, continued to gamble and seems quite accomplished. His income is what his income is.
Curry published and sold a gambler's "tip sheet" at $5 per issue until the commencement of the litigation. Evidently this sheet was of some value to other gamblers as Curry indicated at trial that persons would come by his Super Lube place of business to pick up an issue and he would receive a number of calls from gamblers to obtain, at a price, the information contained therein. Curry's income tax returns showed only $600 to $800 annual income from the sale of the sheet but as previously explained, this Court does not accord substantial weight to this declaration by the Defendant.
Curry did admit to a number of regular customers who paid for his services and variously estimated their number from 8 to 50 per day. He also testified that many times he would not receive payment for his tip. Counsel for Curry characterizes the higher numbers as Curry hyperbole designed to justify his gambling enterprises to his wife and in-laws. Such an explanation is plausible, however, the Court does conclude that Curry did receive some income from the tip sheet. Even accepting Curry's lower estimate as to the number of sales for his tip sheet (10 per day) indicates a gross income of at least $1,000 per month.
It is noted that Curry ceased his tip sheet endeavor concurrently with the breakup of his marriage and with the commencement of this litigation and thus he no longer has that income. The Court will accept Curry's testimony that he no longer produces the tip sheet and that he ceased doing so mainly as a result of the confusion that resulted from the breakup of his marriage. But the tip sheet enterprise is instructive and is a good indication of how Curry was able to derive substantial income from his gambling activities.
Evidence was also admitted which tended to show that Curry's gambling earnings were substantial for the years immediately preceding the commencement of this litigation. For example, earnings from bets on basketball and football exceeded $20,000 annually for a number of years. The fact that these figures are gleaned primarily from Curry's own admissions indicates to the Court that these figures are probably somewhat conservative.
A spotty indicator of Mr. Bagwell's income from other gambling activities are the W2-Gs which were generated by various gambling establishments after substantial winnings by Mr. Bagwell. Curry produced some W2-Gs and Kay uncovered some undisclosed W2-Gs by issuing subpoenas to likely gaming establishments [frequented by Curry]. These records showed substantial winnings over a two-year period (preceding the date of the filing in this case of June 16, 1999) of over $180,000. Mr. Bagwell won over $11,000 in July of *863 1999, after the filing of this suit for divorce.
This Court is aware that gambling is, by its very nature, an unreliable and unsteady source of income. But [it] is also established by the evidence introduced into this case, that Curry Bagwell was successful for a number of years in generating income from his gambling endeavors. He continues to enjoy sports and gambling and there is no evidence to show that his fortunes have waned.
The record shows that Curry is, if not a "professional," at least a very accomplished gambler who spends more time in furtherance of his gambling "hobby" than he does managing his Super Lube business. As found by the trial court, the evidence reveals that Curry gambled quite a bit more than what he testified and that he had gambling income from three different sources: betting on the horses, wagering on college and professional football and basketball games and producing his tip sheet.
Considering only the W-2G forms that racetracks are required to file with the federal government, for the 19 months preceding this action, Curry realized winnings from horse racing bets on an average of $10,000 per month. In addition, for the year 2001, from January 1, 2001, through June 6, 2001, Curry's reported gambling income from horse racing as reported on W2-G forms is in excess of $172,000. The only gambling income reported by Curry on his tax returns is the amount reported to the Internal Revenue Service by the racetracks on the W-2Gs. Curry testified, and his C.P.A. confirmed, that he does not report track winnings for which no W-2G (any amount less than $600) is required nor does he report income from any of his other gambling endeavors.
Curry argued to the trial court that his gambling losses either equaled or, better yet, exceeded his gambling income. Not only does the documentary evidence and testimony belie this argument, but, more importantly, Curry has absolutely no records of the claimed losses. Curry testified that he does not have a bank account, but operates on a "cash" basis. He further stated that he keeps no records of any of his gambling activities, wins, losses, bets placed, expenses, etc. As noted by the trial court, Curry even testified to having had a friend go to the race track to pick up some losing tickets from the ground to use as evidence of losses should the I.R.S. audit him.
Considering the above, we find no abuse of the trial court's discretion in its conclusion that Curry's monthly income from gambling is $8,000.

(2) Income from Super Lube
Curry next urges that the trial court erred in finding that he had monthly income from Super Lube of $2,868.93 and in basing his child and/or interim spousal support obligation(s) upon this amount.
Just as a person cannot avoid his alimony or child support obligation by voluntarily leaving his employment, one cannot avoid all or part of his obligation by exercising his exclusive control over a corporation wholly owned by him to manipulate or limit his own salary. Baggett, supra; Moncus v. Moncus, 510 So.2d 1271 (La.App. 3d Cir.1987), writ denied, 514 So.2d 462 (La.1987). As noted by the court in Baggett, supra at 269, the owner of a closely held corporation or business is more than an ordinary employee. As such, he has unlimited access to the corporate accounts and has complete control over corporate policy. Furthermore, because closely held corporations present the opportunity for underestimating the *864 value of the benefits received, La.R.S. 9:315(4) (2000)[9] effectively disregards the corporate entity and provides that revenues of the corporation are to be treated as revenues of its owner. Id.
The following is excerpted from the trial court's written reasons for judgment:
The evidence [of] record convinces the Court that the parents of Mr. Curry Bagwell substantially supported Curry and Kay during the existence of their marriage.... [T]he senior Bagwells subsidized the Super Lube business by injecting amounts of capital to support the operation of that enterprise. These payments were offset somewhat by the fact that the elder Bagwells received farm income that was due to Curry and administered that amount.... [W]hile Curry now owns the Super Lube business entirely [having agreed with Kay in a community partition settlement to obtain full ownership], the actual physical location of the business is owned by his parents. Subsequent to the breakup of Curry and Kay, the rental that Super Lube is obligated to pay the elder Bagwells increased from $1 yearly [should be monthly] to $1,250 per month. This was apparently a joint decision between Curry and his parents despite a written lease agreement obligating him only to the lower $1 amount. There is nothing odious about this business decision per se, but it is an example of the kind of machinations that the Bagwells went through in order to make sure Curry's income was minimized as much as possible. There are significant reasons to regard these transactions with some suspicion; the proximity in time to the breakup of Curry and Kay of repayment of "loans" back to the elder Bagwells and the frankly stated antipathy of the elder Bagwells towards Kay. Curry and the elder Bagwells have the incentive to characterize their business transactions in such a fashion as to benefit Kay the least.
Evidence produced by the Defendant in the form of the testimony from a Certified Public Account[ant] who examined the books of Super Lube to determine its performance from July 1, 1999, to [the] date of [the] hearing caused that expert to form an opinion that Super Lube yielded an operational profit of approximately $350 weekly. The Court declines to accept that figure. The evidence clearly showed that Curry, in previous years, removed substantial sums of money from the operating capital or gross income of Super Lube for personal expenses and to pay expenses associated with his gambling enterprises. The Court has already mentioned the increase of $1,249 per month in rental expense concocted between Curry and his parents. And, Curry's testimony about many of the substantial withdrawals from the Super Lube accounts over the past couple of years was equivocal and is viewed with some considerable suspicion.
All of the above outlined equivocation, fabrication and restructuring of past financial transactions leave the Court with the difficult task of determining the true income of Curry Bagwell. While his parents are under no legal obligation to continue supporting Curry's lifestyle in the manner that they have, the Court cannot escape the conclusion that their support of Curry and participation in some of the concealment schemes enabled Curry to casually manage the Super *865 Lube business in order to concentrate on his gambling enterprises (the source of difficult to establish, although substantial, income); conceal real income of his by "kicking back" to his parents "loan repayments"; and force Kay into difficult financial straits by failing or refusing to pay certain necessary family expenses....
Having reviewed the record in its entirety, we cannot say that the trial court erred in finding that Curry's monthly income from Super Lube was $2,868.93.[10]

(3) Trust Income
According to Curry, the trial court erred in assigning to him and including in his gross income trust income in the amount of $1,000 per month. Curry notes that he is not a fixed income beneficiary and that he does not have the discretion to withdraw or accumulate income.
La.R.S. 9:315(4)(a) defines gross income as income derived from any source, including trust income. In this case, as in Kern v. Kern, 00-1126 (La.App. 4th Cir.04/25/01), 786 So.2d 193, the trial court made the factual finding that the beneficiary spouse derived income from the trust. In Kern, however, the trust allowed the spouse to withdraw funds at her discretion to support herself and her children. In the instant case, the discretion is vested in the trustee, who is Curry's brother.
Of critical importance is that, until Kay filed for divorce, funds were disbursed annually to Curry or his parents for Curry's benefit, who in turn used the monies to pay his children's educational expenses[11] and to support his family's rather extravagant lifestyle.[12] Once the instant action was instituted, however, the trustee "exercised his discretion" and decided not to pay out any income to Curry, but instead chose to accumulate the interest.[13] We fail to see the difference, inasmuch as Curry was nonetheless required to report the accumulated earnings to the I.R.S. for income tax purposes. Furthermore, La.R.S. 9:2005 specifically authorizes, in summary proceedings to which the trustee, beneficiary and creditor are parties, seizure of any part of a trust beneficiary's interest in the trust or its income to satisfy alimony or support obligations. This provision likewise specifies that such seizure is permitted notwithstanding any stipulation in the trust instrument to the contrary.
As for the $1,000 per month trust income assigned to Curry by the trial court, the record shows that Curry's 1997 tax return reported that the trust paid to or for his benefit $21,801 for that year and his 1998 tax return reported yearly income of *866 $10,781. Additionally, both Curry and his C.P.A. testified that he had to report trust income on his 1999 tax return even though the income was accumulated and not disbursed as it had been in previous years. We find no merit to this argument.

Income Attributable to Kay
Curry next takes issue with the trial court's determination that Kay's monthly income was only $358 and assignment to her of a mere 3% of the parties' monthly gross income. It is his position that Kay is voluntarily underemployed and he asks this court to so find and fix her monthly earning capacity at $1,032, which is what she would earn if she worked 40 hours per week at a rate of $6.00 per hour.
La. R.S. 9:315.9 (2000) provides that:
If a party is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of his or her income earning potential, unless the party is physically or mentally incapacitated or is caring for a child of the parties under the age of five years....
The court shall consider a party's earning capacity in light of all of the circumstances. Hansel, supra; Rovira v. Mire, 587 So.2d 149 (La.App. 4th Cir. 1991). Voluntary unemployment is a question of good faith on the part of the obligor spouse. Clark v. Clark, 34,314 (La.App.2d Cir.11/01/00), 779 So.2d 822, writ denied, 00-3196 (La.01/12/01), 781 So.2d 563; Gould v. Gould, 28,996 (La.App.2d Cir.01/24/97), 687 So.2d 685; Hansel, supra. The trial court's finding as to whether the obligor spouse is in good faith is a factual determination which will not be disturbed on appeal absent an abuse of the court's wide discretion. Clark, supra; Gould, supra.
Early in their marriage, the parties agreed that Kay would not seek employment, but would be a "stay at home" mother and raise their three children. As of trial, however, two of the three children had reached the age of majority and the youngest was ten years old. Kay had been employed on a part-time basis for the past nine years as a teacher's aide at a church day school. Notwithstanding Kay's argument that she has no formal education or other training, clearly she is capable of obtaining full-time minimum wage employment. Therefore, we find that the trial court erred in failing to find that Kay was voluntarily underemployed. Regardless of whether she chooses to seek a full-time job, Kay is nonetheless responsible for her share of the total child support obligation.
The trial court found that Curry's monthly income was $11,868.93. To this we will add the amount which is imputed to Kay, or $1,032. The parties' total monthly income is $12,900.93. Kay's proportionate share is $1,032 divided by $12,900.93, or 8% and Curry's proportionate share is $1,032 divided by $12,900.93, or 92%. The trial court set the basic monthly child support obligation at $1,056.[14] Curry is therefore responsible for 92% of this amount, or $971.52.[15]

Applicable Legal PrinciplesSpousal Support
A spouse may be awarded an interim periodic allowance based on the *867 needs of that spouse, the ability of the other spouse to pay and the standard of living of the spouses during the marriage. La.C.C. art 113; Clark, supra. A spouse's right to claim interim periodic support is based on the statutorily-imposed duty of the spouses to support each other during their marriage. McAlpine v. McAlpine, 94-1594 (La.09/05/96), 679 So.2d 85.
In order to demonstrate need for interim periodic spousal support, the claimant has the burden of proving that she lacks sufficient income or the ability to earn a sufficient income to maintain the standard of living that she enjoyed during the parties' marriage. Id.; Thomey v. Thomey, 33,000 (La.App.2d Cir.04/07/00), 756 So.2d 698.
The trial court is afforded much discretion in determining an award of interim spousal support. Such a finding will not be disturbed absent a clear abuse of discretion. Id.; McDermott v. McDermott, 32,014 (La.App.2d Cir.06/16/99), 741 So.2d 186. Encompassed in the trial court's discretion is the ability of the court to examine the spouses' entire financial condition, which is not limited only to income, but also any resource from which his or her needs can be supplied, including a spouse's earning capacity. Smoloski v. Smoloski, 01-0485 (La.App. 3d Cir.10/03/01), 799 So.2d 599; Goldberg v. Goldberg, 96-2145 (La.App. 4th Cir.07/23/97), 698 So.2d 63.
Curry asserts that the trial court erred in awarding spousal support based upon a monthly income of $11,868.93. However, as found above, we find no manifest error in this factual finding of the trial court. We also note that the evidence presented at trial showed that the parties maintained a rather luxurious standard of living during their marriage. Considering Kay's standard of living while married to Curry, his income of at least $11,868 per month and her earning capacity of $1,032 per month, we find no abuse of the trial court's discretion in its award of interim spousal support in the amount of $2,500 per month.

Conclusion
For the reasons set forth above, the trial court's judgment is amended in part to reflect that Curry shall pay child support to Kay in the amount of $971.52 per month and shall be responsible for paying 92% of Christopher's health insurance premium, as well as 92% of all of the child's medical, dental, prescription drug and orthodontic expenses not covered by insurance. In all other respects, the judgment of the trial court is AFFIRMED.
Costs of this appeal are assessed as follows: ¾ to defendant-appellant, S. Curry Bagwell and ¼ to plaintiff-appellee, Katherine G. Bagwell.
CARAWAY, J., concurs.
NOTES
[1] Each month the senior Bagwells paid the couple's mortgage note, all utilities (except telephone), automobile and health insurance and country club dues.
[2] Pursuant to Acts 2001, No. 1082, § 1, the legislature amended La.R.S. 9:315.19. As noted in the revision comments, the principal effect of the 2001 amendment is to extend the schedule amounts of parents' combined adjusted gross income to $20,000. The amended provision applies to child support actions filed after August 15, 2001.
[3] La.R.S. 9:315.10 (2000), enacted by Acts 1989, No. 9, § 1, was redesignated as La.R.S. 9:315.13 by Acts 2001, No. 1082, § 1. La.R.S. 9:315.13(B) as it currently reads provides:

If the combined adjusted gross income of the parties exceeds the highest level specified in the schedule contained in La.R.S. 9:315.19, the court shall use its discretion in setting the amount of the basic child support obligation in accordance with the best interest of the child and the circumstances of each parent provided in La.C.C. art. 141, but in no event shall it be less than the highest amount set forth in the schedule. As noted in the revision comments, article 141, which governs the award of child support at divorce, provides that child support is to be determined based upon the needs of the child as measured by the standard of living enjoyed by the child while living with his intact family and upon the ability to pay of each parent.
[4] After noting that Curry and his family had, both before and after the dissolution of the parties' marriage, received substantial financial assistance and/or subsidies from his parents, the senior Bagwells, the trial court declined to include what it characterized as gratuitous benefits in its calculation of Curry's monthly income. Likewise, the trial court did not attribute to Kay assistance she had been receiving from her father since the parties' separation.
[5] The court also recognized that Curry had in the past other sources of income which, as of trial, were no longer available to him, such as income from his publication of a horse racing tip sheet, farm income and stock dividends.
[6] La.R.S. 9:315 was amended and reenacted by the legislature as part of its extensive overhaul of the child support guidelines in 2001. See Acts 2001, No. 1082, § 1.
[7] In a footnote, the court noted that Mr. Bagwell allowed the introduction into evidence of a number of losing tickets that were picked up off the ground at race tracks and which had no connection at all with Mr. Bagwell's actual gambling wins or losses.
[8] At the time the mother filed her rule to increase child support, the father was going through a divorce. Because the father was married at the time he won the lottery, the proceeds were community property and he would be receiving one-half of the prize money, which is $29,426.62, annually.
[9] This provision was amended and reenacted as La.R.S. 9:315.11 by the legislature in 2001. See Acts 2001, No. 1082, § 1. As are the rest of the revised provisions, this statute is applicable only to child support actions filed after August 15, 2001.
[10] In arriving at this amount, the trial court took the weekly profit amount provided by Curry's C.P.A., John Robinson, multiplied it by 52 and then divided it by 12 to arrive at $1,619.93 per month. To this amount, the court then added back in $1,249, which is the difference between the contrived rent amount concocted by Curry and his parents and the actual $1 per month rent as provided for in the lease.
[11] Contrary to Curry's assertion that the trust was created to fund his children's education, the trust instrument does not contain a restriction limiting either the income or corpus to educational expenditures.
[12] The evidence reveals that there is a long history of trust income being sent directly to Curry's parents to pay for his family's living expenses.
[13] When the Bagwells separated in April 1999, Curry's brother Norman instructed his parents, the senior Bagwells, to return to him all trust monies that were sent directly to them. Also at that time, Norman withdrew for his personal use $9,500, which he characterized as a loan repayment. In November 1999, a month before trial of this matter, Norman wrote a $5,000 check on the trust account for what he called "cash reserves."
[14] As noted above, the schedule set forth in La.R.S. 9:315.19 (2000) specifically provides for a combined adjusted monthly income of up to $10,000. The trial court set the child support obligation at the maximum amount provided in the schedule and we do not find this to be an abuse of its discretion.
[15] In her brief, Kay contends that the trial court erred in failing to add to the basic child support obligation the cost of Christopher's private school tuition. Inasmuch as she neither appealed nor answered Curry's appeal, however, this issue is not properly before this court and we will not address it.