# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-889

SHAUNN CAILLIER MCCORVEY

VERSUS

DERRIEL CARLTON MCCORVEY

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 02-C-2619-A
HONORABLE AARON FRANK MCGEE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Oswald A. Decuir, and Marc T. Amy, Judges.

AMY, J., CONCURS.

AFFIRMED IN PART; MODIFIED AND AMENDED IN PART; REVERSED IN PART.

Alex L. Andrus, III
Guglielmo, Lopez, Tuttle, Hunter & Jarrell, LLP.
306 East North Street
Opelousas, LA 70570
Telephone:  (337) 948-8201
COUNSEL FOR:
    Plaintiff/Appellee - Shaunn Caillier McCorvey

Glenn James Labbe
P. O. Box 90870
Lafayette, LA 70509
Telephone:  (337) 233-3033
COUNSEL FOR:
    Defendant/Appellant - Derriel Carlton McCorvey

**Derriel Carlton McCorvey**
**P. O. Box 2473**
**Lafayette, LA 70502**
**Telephone:  (337) 291-2431**
**Pro Se**

THIBODEAUX, Chief Judge.

In this seemingly endless, fractious and contentious domestic dispute, Defendant, Derriel McCorvey, appeals from the trial court's judgment on the partition of the community property, the child support award, contempt and sanction issues, and cost assessment. For the reasons set forth below, we affirm in part, reverse in part, and modify and amend in part the judgment of the trial court. Additionally, Plaintiff, Shaunn Caillier McCorvey, now Harden ("Harden"), seeks sanctions by this court against McCorvey regarding his appellate brief. We decline to impose sanctions at this time as set forth fully below.

I.

## ISSUES

The issues to be determined are:

1) whether the trial court erred in sanctioning Derriel C. McCorvey;

2) whether the trial court erred in determining the monthly child support obligation;

3) whether the trial court erred in assessing the child support delinquency;

4) whether the trial court erred in ordering Derriel C. McCorvey to pay 62.5% of uncovered medical expenses for the minor child;

5) whether the trial court erred in denying Derriel C. McCorvey's motion to decrease child support;

6) whether the trial court erred in partitioning the community property of the parties;

7) whether the trial court erred in assessing 90% of the court costs to Derriel C. McCorvey; and,

8) whether Plaintiff's motion for sanctions and the return of Defendant's appellant brief should be granted by this court.

1

## FACTS

Harden and McCorvey were married in December 1993. Of the marriage, one daughter was born in 2001. Both parties are practicing attorneys. Harden is an assistant district attorney in St. Landry Parish and has a few private clients in that parish. McCorvey is the sole proprietor of a law practice in Lafayette.

On June 24, 2002, Harden filed suit for divorce from McCorvey on the grounds of adultery. Numerous child custody and community property issues have been litigated and appealed. Our court has become quite familiar with the parties, the voluminous records, and the divisive issues which appear to be driven more by emotion and ego than by complexity.

In August 2002, an intake conference was held before a hearing officer in an attempt to evaluate the financial records of the parties, establish income, and determine child support issues. McCorvey initially withheld documents, resulting in two income determinations of his income by the hearing officer, one for $6,500.00 per month, and one for $23,000.00 per month.

On November 8, 2002, the presiding judge at that time, Judge James Genovese, ordered McCorvey to pay $673.00 per month in child support, retroactive to the date of judicial demand, June 24, 2002.

The divorce judgment was issued on November 21, 2002. McCorvey and Harden reserved the rights to other relief on incidental demand such as partition and support. The matters currently before us are the partition of community property and the child support issues. There is no issue of immovable real property before us.

In November 2004, the hearing on child support and partition of the community property was held before Judge Aaron McGee over several days. He issued a judgment on the issues on January 25, 2005, modifying the child support

award and apportioning community assets and liabilities. It is from this judgment that McCorvey appeals. As set forth in the analysis below, the judgment appealed from is affirmed in part, reversed in part, modified and amended in part.

III.

## LAW AND DISCUSSION

### *Standard of Review*

An appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is "convinced that had it been sitting as the trier of fact, it would have weighed that evidence differently." *Housely v. Cerise*, 579 So.2d 973, 976 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

3

On legal issues, an appellate court gives no special weight to the findings of the trial court. Instead, we review the decision or judgment to determine if it is legally correct or incorrect. *Ducote v. City of Alexandria*, 95-1269 (La.App. 3 Cir. 7/17/96), 677 So.2d 1118.

### Sanctions For Contempt Against Derriel C. McCorvey

On September 8, 2004, the trial court ordered the parties to submit their work-in-progress as of the date of filing for divorce on June 24, 2002. The court allowed seventy-two hours to file objections to the procedure, and the work was made due on October 18, 2004. No objections were filed, but McCorvey failed to submit any work. Harden submitted her work-in-progress and requested sanctions against McCorvey in November 2004. In the current judgment, McCorvey was found in contempt of court for failure to submit any files or summaries. In its Reasons for Judgment, the trial court stated:

> One of the issues submitted to the Court involved discovery and . . . "Motions to Compel" filed by each party relating to evidence associated with the issues of partition of community and . . .child support. . . . it was obvious to the Court that additional information needed to be exchanged by the parties related to their "work in progress files." . . . the Court directed the attorneys to prepare a worksheet containing . . . information which would comply with the discovery motion, as well as assist the Court in valuing the "work in progress" of each of the party litigants. . . . also directed the attorneys to make available to the Court the actual files . . . source documents necessary to test the credibility of the information. . . . The plaintiff, Shaunn Caillier McCorvey Harden, complied with the Court's directive, but the defendant saw fit to ignore the Court's Order and go on an elk hunt instead. The defendant's excuse was that the elk hunt had been preplanned. The Court noted that there was no attempt by the defendant to ask for additional time and, in effect, it is obvious to the Court that the defendant made no effort whatsoever to even attempt to comply with the Court's order.

The trial court was impressed by the fact that McCorvey had made no effort at partial compliance, no attempt to report on a portion of the files or even a single file. In its Reasons for Judgment, the trial court further explained the necessity of appointing a very capable and seasoned attorney to do the work that McCorvey failed to do, to review and summarize McCorvey's work-in-progress. The court ordered McCorvey to deposit $5,000.00 into the registry of the court for the appointed attorney and to submit the files for review. McCorvey finally submitted his files, and on the last day allowed by the court, he deposited his check for $5,000.00. The check was returned as insufficient. The court immediately instructed the appointed attorney to stop reviewing McCorvey's files.

The trial court noted McCorvey's consistent contempt of court orders including his previous violation of Judge Genovese's order by injecting racism into his child's life, and the violation of a restraining order by taking undisclosed, unilateral action regarding community assets with a potential value of over $600,000.00 in disputed attorney fees. The trial court then noted its discretion in imposing sanctions for violation of discovery orders and referred to the factors cited in the case of *Hutchinson v. Westport Ins. Corp.*, 04-1592 (La. 11/08/04), 886 So.2d 438, where the suit of a pro se plaintiff was dismissed for violating discovery orders.

The supreme court in *Hutchinson* reinstated the dismissal of the trial court. It noted that the violation was solely the fault of the plaintiff who was impatient, unrealistic in her expectations of damages and of her several attorneys, and who insisted upon representing herself against the court's warnings. Four factors were examined in affirming the trial court's dismissal for the discovery violation: "(1) whether the violation was willful or resulted from inability to comply; (2) whether less drastic sanctions would be effective; (3) whether the violations prejudiced the opposing party's trial preparation; and, (4) whether the client

5

participated in the violation or simply misunderstood a court order or innocently hired a derelict attorney." *Hutchinson,* 886 So.2d at 440.

In the present case, the trial court stated in its reasons for judgment:

As these [factors] apply to the case at bar, the Court specifically concludes that the violation was willful, that the action which it is taking is not exactly in the nature of a dismissal but is reasonable under the circumstances, that the violation did, in fact, prejudice the opposing party's trial preparation, and that finally, the violation was not as a result of a misunderstanding or the dereliction of the retained attorney, Mr. Labbe, but rather was orchestrated solely and only by the defendant who is, in fact, a practicing attorney and who, for all intents and purposes, represented himself for the most part in the case at bar rather than relying upon his capable retained attorney. That having been said, the penalty which will be imposed by the Court against the defendant as relates to the above is that the Court will intentionally disregard all evidence submitted by the defendant on the issue of "work in progress" information, (except as will be noted elsewhere in this decision).

The trial court then noted that the "NSF check was eventually 'made good' but that action was untimely." We note further that the record indicates that McCorvey filed a motion for a refund of the $5,000.00, and the money was refunded to him. Our Code of Civil Procedure provides that constructive contempt is wilful disobedience of any lawful judgment, order, mandate, writ, or process of the court. La.Code Civ.P. art. 224. If a party fails to obey an order to provide discovery, the court in which the action is pending may make such orders as are just, including prohibiting a party from introducing designated matters in evidence and may treat the failure to obey as a contempt of court. La.Code Civ.P. art. 1471. The trial court is vested with great discretion in determining whether a party should be held in contempt for disobeying the court's order and its decision will only be reversed when the appellate court can discern an abuse of that discretion. *Martin v. Martin*, 457 So.2d 189 (La.App. 2 Cir. 1984); *See also Hutchinson*, 886 So.2d 438.

6

McCorvey complains that the order regarding the "work-in-progress" was overly burdensome because "the sheer volume" of his files subject to the review would "shut down" his law practice. We note that McCorvey was given approximately six weeks to compile the information, and that he instead chose to spend his time hunting elk in Colorado for ten to fourteen days. Moreover, McCorvey complains that his $5,000.00 check was insufficient because his funds were "gravely exhausted due to a decrease in my business." We ponder what might have happened to the fees from his voluminous files and the "robust personal injury practice" that he uses as an excuse for not preparing his files according to the court's order. McCorvey's arguments are inconsistent and ring hollow. We find no abuse of discretion and affirm the trial court's ruling regarding McCorvey's "work-in-progress."

### *Monthly Child Support Obligation*

The trial court determined that McCorvey had a monthly income of $7,500.00, which the court described as a "conservative" calculation. Based upon this figure, the court calculated a basic child support obligation of $1,198.26 per month with an additional $132.15 for McCorvey's share of the medical insurance premium, and an additional educational expense of $214.46 per month. Accordingly, McCorvey was ordered to pay a total of $1,544.87 to Harden for support and care of their minor child. Harden was ordered to maintain hospital coverage on the minor child through her employer, the district attorney's office, as long as it was available to her. The trial court ordered McCorvey to pay 62.5% of any uncovered medical expenses that the minor child incurred.

The court found its award of child support to be the first formal determination of the issue and ordered that the monthly award be retroactive to June

24, 2002, the date of Harden's filing of suit for divorce and child support. After crediting McCorvey with amounts paid, the trial court calculated and ordered him to pay $27,027.97 in child support arrearage by paying an additional $500.00 per month plus legal interest until the delinquency was paid. McCorvey argues that the trial court erred in determining each element of this award. Due to errors in calculation, we reduce the total monthly child support award to $1,198.26. Additionally, we reverse the portion of the judgment awarding retroactive child support. We affirm the child support award in all other respects.

A.     *McCorvey's Monthly Income*

As to the basic calculation of monthly income, the trial court scrutinized the evidence of income for McCorvey including tax returns, bank deposits and cancelled checks. McCorvey argues that his monthly income for 2004 was $3,038.54, based upon a year-to-date calculation of $36,462.50. However, it was demonstrated at trial that McCorvey has historically misrepresented his income. The record indicates that during the community property regime, he brought in fees and wrote checks far in excess of the income claimed on his returns. For example, McCorvey's tax return for 2001 showed gross income of $44,111.00, expenses of $31,136.00, and a net profit of $12,058.00. Yet, his cancelled checks indicated a possible gross income of over $194,000.00 with net income of over $163,000.00, and in any event strong evidence of a six-figure income for 2001, even if, as McCorvey argues, he did not collect all criminal fees shown in his retainer agreements.

When examined at trial, McCorvey testified that he relied on his accountant and stated as to his 2001 returns, "Well, if those numbers are borne out, then it appears to be someone made a mistake." In his very next response, he stated, "If - - I would say, for 2002, if - - if those numbers will bear out when you talk about

receipts . . . my cash receipt book, you know, if you're talking about that, then, you know, apparently it seems again to be an error."

McCorvey swore that he had a monthly income of $2,545.39 per month in 2002 at the initial intake conference in August 2002. It was later determined that he had received a $90,000.00 fee in one case alone. Ultimately, McCorvey filed a tax return reporting gross receipts of $258,452.00 in 2002 and adjusted gross income of $153,776.00. However, as shown above, the trial court found McCorvey's tax returns untrustworthy, and he himself admitted that his 2002 return was "apparently" in error. Based upon McCorvey's records eventually obtained through discovery and the intake conference, Harden asserts that McCorvey had an income of at least $287,172.89 in 2002 and an adjusted income after expenses of $229,106.24. This is based upon McCorvey's trust account deposits, criminal contracts, receipt book income, and a $60,000.00 fee received on December 20, 2002, the result of his arbitrating a fee dispute of over $600,000.00 against court orders and apparently accepting less than 10% of the disputed amount.

McCorvey showed a loss of approximately $7,000.00 in 2003. However, the credibility of this report was brought into question at trial.

McCorvey asserts an income of $3,038.54 per month at the time of trial in 2004. However, the trial testimony reveals conflicting information. At trial in November 2004, Harden's counsel asked McCorvey, "but, you're telling us now, instead of making six figures a year, you're only making . . . five hundred forty-four dollars a month?" McCorvey responded, "That was accurate. I said that's what my data indicates . . . ." He then claimed a dry spell in his business. When Harden's counsel asked how he was paying $673.00 per month in child support on an income of $544.00 per month, McCorvey responded that he was living on a line of credit and

9

had filed a rule to decrease child support. Harden's counsel pointed out that McCorvey did not file the motion to decrease child support until May of 2004.

In his appellate brief, McCorvey denies testifying to an income of only $500-$600 per month. As shown above, the record indicates otherwise. That is not to say that he did not also testify, as he asserts now in his appellate brief, that his monthly income for 2004 was $3,038.54 based upon an alleged $36,462.50 in annual income. He apparently indicated both amounts at trial. The record is replete with McCorvey's inconsistencies and refusals to give straight answers regarding his income and expenses as well as all other facets of this litigation.

The record indicates that McCorvey has consistently grossly under-reported and misrepresented his income, refused to submit documents at the intake conference, while asserting they were outside in his vehicle, and refused to submit work-in-progress files. Moreover, he has admitted that he does not always give receipts for cash payments "unless" the client asks for a receipt. When accused of not depositing all of the funds he receives as income, he did not respond "yes I do," but rather has repeated the evasive statement that it has been his "practice" to deposit all fees received. McCorvey has given testimony in contradiction of the evidence and in contradiction of his own previous testimony.

With regard to the fee dispute of over $600,000.00, McCorvey violated the court injunction by unilaterally participating in the arbitration and accepting $60,000.00, roughly 10% of the disputed fees, even though he earlier testified in his deposition that he was entitled to "probably half a million dollars" in fees from that case. In further self-contradiction, he later testified, regarding the $60,000.00 fee, that he received *more* from the arbitration than he expected. In further evidence that McCorvey habitually under-reports his true income, sometimes verbally and sometimes on paper, the court-appointed hearing officer assigned to review his

10

records in 2002 testified that McCorvey had reported about one ninth of his actual income.

The trial court indicated that if Defendant had a low income in 2004, that he was underemployed through his own fault. We note that the child support guidelines address the voluntary unemployment or underemployment of a parent and assess such parent his "potential" income for the computation of the child support obligation. La.R.S. 9:315(C)(6)(b); see also *Donna G.R. v. James B.R.*, 39,005 (La.App. 2 Cir. 7/2/04), 877 So.2d 1164, *writ denied*, 2004-1987 (La. 9/03/00), 882 So.2d 550. Likewise, the wage earned prior to voluntary unemployment or underemployment is the best estimate of earnings potential. See *Saucier v. Saucier*, 98-659 (La.App. 3 Cir. 10/07/98), 719 So.2d 702 and *Glover v. Glover*, 28,493 (La.App. 2 Cir. 6/26/96), 677 So.2d 659.

The trial court stated in its Reasons for Judgment that it had no reason whatsoever to question the veracity of Harden or her documentation of income. However, with regard to McCorvey, the court stated,

> On the other hand, the Court has every reason to be suspicious of the testimony and the numbers submitted by the defendant. Specifically, the Court finds the testimony of the defendant to be unworthy of belief. The Court further finds the documentation submitted by the defendant to be unreliable in that it does not pass simple accounting, checks and balances, and "smacks" of fraud and deceit.

Ultimately, the trial judge, who stated that he had, prior to taking the bench, prepared hundreds of tax returns, received McCorvey's documentation of income. Considering all of the evidence and testimony, he attributed to McCorvey a monthly income of $7,500.00, which indicates a finding of income after expenses of $90,000.00 per year. The court called its assessment "conservative." We agree, particularly where there was evidence of possible net income of over $163,000.00 in 2001, and where Defendant filed a return in 2002 indicating gross receipts of over

11

$258,000.00 and net income of over $150,000.00. Moreover, the trial court has great discretion in these matters, and this particular trial judge appears to have more than the usual experience in evaluating evidence of income. Especially in the present case, given the convoluted and self-conflicting nature of McCorvey's assertions, and the credibility issues raised by his conduct throughout this litigation, the trial court is in the best position to evaluate the evidence and testimony.

In *Verges v. Verges*, 01-208 (La.App. 1 Cir. 3/28/02), 815 So.2d 356, *writ denied,* 02-1528 (La. 9/20/02), 825 So.2d 1179, the appellate court affirmed that Mr. Verges had an income of at least $30,000.00 per month, even though one of his annual tax returns showed his total income as a loss of $6,080.00. There, after considering all of the testimony and documentary evidence, the trial court rejected Mr. Verges' income tax returns as not setting forth his true income, and found that many of the expenses reflected therein were inaccurate or inapplicable for purposes of determining his obligation to pay child support. The appellate court in *Verges* articulated as follows:

> [O]ne cannot avoid all or part of his child support obligation by exercising exclusive control over a corporation wholly owned by him in order to limit his own salary. *Hudnall v. Hudnall*, 2000-0330, p. 5 (La.App. 1st Cir. 5/11/01), 808 So.2d 641, 644-45.

> As the trial court so eloquently stated in *Hudnall*:

>> Parents are obligated to contribute to the support of their children and they must contribute in light of the child's needs as well as the circumstances of the parents. Child support is a primary obligation. Therefore, the Court will not allow a person to shield their income in order to diminish their liability owed to a child. It is the parties [sic] obligation to be honest and forthcoming regarding the establishment of his or her legitimate income and any diminutions to that income.

*Hudnall*, 2000-0330 at p. 5, 808 So.2d at 644-45.

> Because the evidence showed, and the trial court found, that Mr. Verges' tax returns were erroneous and self-serving, in that the income shown was based on recapitulated figures and amounts submitted by Mr. Verges (or his office manager) to his accountant who accepted them without question, and was at odds with the other testimony and evidence elicited, the trial court correctly rejected Mr. Verges' contention that these accurately set forth his available income. Here, the trial court rejected Mr. Verges' testimony and concluded he had failed to disclose the true nature of his income. In doing so, the trial court obviously accepted the testimony of Mr. Verges' witness, Dwayne Harper, the vice-president of commercial lending at Cottonport Bank, and other documents and testimony introduced at trial, and rejected Mr. Verges' testimony concerning the figures shown on his tax returns.

*Verges*, 815 So.2d at 363.

It is well-settled that the district court's conclusions of fact regarding financial matters underlying an award of child support will not be disturbed in the absence of manifest error. *Romans v. Romans*, 01-587 (La.App. 3 Cir. 10/31/01), 799 So.2d 810. Likewise, the trial court has wide discretion in determining the credibility of the witnesses; whether the obligor spouse is in good faith in ending or reducing his income is a factual determination which will not be disturbed absent an abuse of discretion. *McDaniel v. McDaniel*, 03-1763 (La.App. 3 Cir. 5/19/04), 878 So.2d 686, *citing Havener v. Havener*, 29,785 (La.App. 2 Cir. 08/20/97), 700 So.2d 533.

In the present case, the trial court made a finding of fact that McCorvey's monthly income for calculating the child support award using the statutory worksheet was $7,500.00 per month. We note that in calculating McCorvey's income, it appears that Judge McGee averaged his worksheet income for the years 2002 through 2004 at $90,000.00 per year, based upon pertinent parts of the six volumes of financial information filed as exhibits into the record, rather than the unreliable tax returns of McCorvey. We find no abuse of discretion in the averaging of the income. See

*Patrick v. Patrick*, 34,799 (La.App. 2 Cir. 4/4/01), 785 So.2d 169, where the court ordered an increase in child support and directed the lawyers to calculate child support according to the child support worksheet, using an average of the parents' incomes for 1996 to 1998.

Extensive evidence and testimony was examined by the court. Although the trial judge did not outline in detail how he reached the sum of $7,500.00 per month, his calculation is supported by the record, which indicates annual income potential far in excess of six figures. "The trial court must consider the totality of the circumstances of each case in rendering an award of child support." *Bagwell v. Bagwell*, 35,728, p. 4 (La.App. 2 Cir. 3/8/02), 812 So.2d 854, 858. Since the trial court must use its discretion in setting the amount of child support based upon the facts before it, an appellate court is not to disturb the trial court's factual findings absent an abuse of its discretion or manifest error. *Rosell*, 549 So.2d 840. Accordingly, we will not disturb the trial court's determination of income.

B.    *Medical Expenses of Minor Child*

McCorvey asserts that Harden waived her right to reimbursement of medical insurance premiums for the minor child during the 2002 hearing on interim child support. Harden asserts that McCorvey's exhibit in that regard supports no such agreement. She testified that the district attorney's office pays her insurance premium, and that she pays her daughter's portion of the insurance premium. Harden further testified that the minor child had medical conditions that preclude changing insurance companies, and that she had attempted to locate less expensive coverage but was unable to do so. Harden stated that at no time did she decline McCorvey's obligation to share in the health care expenses for their minor child. We note that the current child support determination was considered by the trial court to be the first

formal determination of child support, and that the insurance premium is reflected in block 4(b) entitled "Child's Health Insurance Premium Cost" of the official form used by the courts for calculating support under the revised statutes. Accordingly, we affirm the trial court's inclusion of the medical insurance premium as a joint obligation.

### C.     Uncovered Medical Expenses for the Minor Child

The trial court ordered McCorvey to pay 62.5 percent of any "uncovered medical expenses" incurred by the minor child. He asserts this as error and cites *Rodriguez v. Rodriguez*, 02-0439 (La.App. 4 Cir. 1/29/03), 839 So.2d 368, *writ denied,* 03-0621 (La. 5/30/03), 845 So.2d 1059, for the proposition that La.R.S. 9:315.5 does not require the court to order payment of the child's extraordinary medical expense proportionate to the parties' respective child support obligation, absent evidence that such extraordinary expenses existed. McCorvey further indicates that the expense must exceed $250.00, and that the assessment was "clearly in contradiction to La.R.S. 9:315.5" not to clarify this point. He is incorrect.

McCorvey confuses "extraordinary" medical expense with "uncovered" medical expense, and fails to indicate that the percentage allocated to each party is within the trial court's discretion. Moreover, the trial court in this case did not add a dollar amount to McCorvey's obligation in anticipation of an uncovered medical expense. He merely assessed a percentage for any uncovered expenses "incurred." Therefore, when incurred, McCorvey must pay his 62.5%. In *Greene v. Greene,* 93-789 (La.App. 3 Cir. 3/2/94), 634 So.2d 1286, *amended to correct calculations*, 93-789 (La.App. 3 Cir. 7/06/94), 638 So.2d 1245, we ordered each party to pay a share of the medical costs not covered by the insurance proportionate to his or her percentage share of income as shown on the child support obligation worksheet.

15

Courts have allocated uncovered medical expenses at various rates including 30%, 50%, 66%, 70% and 100% to a parent depending on the circumstances. In *Satterfield v. Alline*, 00-2069 (La.App. 4 Cir. 12/12/01), 805 So.2d 309, the court allocated 100% to the father, stating:

> Both of these types of expenses [ordinary and extraordinary medical expenses] are added to the basic child support obligation, and apportioned between the parties according to their percentage of the gross monthly income. However, the child support statutes do not specifically address *non-covered* medical expenses, *for example, deductibles and percentages of charges borne by the patient*. Our brethren in the Second Circuit have repeatedly held that the allocation of payment of future medical expenses not covered by insurance lies within the discretion of the trial court. See State ex rel. *Metcalf v. Samuels*, 34,402, p. 5 (La.App. 2 Cir. 12/20/00), 775 So.2d 1162, 1165; *Welborne v. Welborne*, 29,479, p. 7 (La.App. 2 Cir. 5/7/97), 694 So.2d 578, 583[, *writs denied,* 97-1800, 97-1850 (La. 10/13/97), 703 So.2d. 623]; *Holdsworth v. Holdsworth*, 621 So.2d 71, 78 (La.App. 2 Cir.1993).

*Satterfield*, 805 So.2d at 312-13 (emphasis added).

Accordingly, McCorvey is properly assessed with 62.5% of *all* uncovered medical expenses of the minor child, and there is no minimum or maximum dollar amount at issue.

*D.    Educational Expense*

McCorvey argues that he never agreed to send the minor child to a private school and that he should not be liable for those expenses. Louisiana Revised Statutes 9:315.6 provides that expenses of a private elementary or secondary school may be added to the basic child support obligation by agreement of the parties *or* by order of the court. Clearly, the court ordered the inclusion of these educational expenses, which is allowed under the cited statute. Harden testified that the child's tuition at Academy of the Sacred Heart is $4,000.00 a year with additional fees of $940.00 and cafeteria fees of $23.00 per month. There are nine months of school per

year.  Cafeteria expenses for nine months total $207.00.  Hence, the annual cost is $5,147.00.  The trial court's worksheet showed the educational expense as $428.92 per month, which is correct.  The educational expense is allowed and is correctly calculated.

*E.      Conclusion Regarding Monthly Child Support Award*

However, although McCorvey seems unaware of the error, the trial court appears to have inadvertently attributed him with the insurance premium and educational expense twice.  It included these expenses on the worksheet in the calculation of monthly totals, then added one half of each expense item to McCorvey's total from the worksheet.  More specifically, the worksheet attached to the court's Reasons for Judgment provides the following information.  McCorvey was credited with $250.00 as a pre-existing child support obligation, resulting in an adjusted gross income of $7,250.00 per month for McCorvey.  Harden's income is shown as $4,350.00 per month, for a combined adjusted gross income of $11,600.00.  McCorvey's percentage share of the combined income is 62.5%, and Harden's share is 37.5%, which are correctly entered on the form.

Based upon the schedule of support provided in La.R.S. 9:315.19, under line item 4 on the worksheet, the "Basic Child Support Obligation" for one child whose parents have a combined adjusted gross income of $11,600.00 per month is $1,224.00 per month, which is also accurately reflected on the trial court's worksheet.  The insurance premium of $264.30 is shown as 4(b) on the worksheet, and the educational expense of $428.92 is shown as an extraordinary expense under line item 4(d) on the worksheet.  These are added to the basic obligation of $1,224.00 and bring the "Total Child Support Obligation" under line item 5 to $1,917.22, which is correctly calculated, even though we question the trial court's use of the columns in

17

the form.  Under line item 6, "Each Party's Child Support Obligation," McCorvey's portion is obtained by multiplying 62.5% to the *total* obligation in line item 5, which already includes the monthly insurance and educational expenses, and Harden's portion is obtained by multiplying 37.5% to that total.  Hence, McCorvey's portion is $1,198.26, and Harden's portion is $718.96, *of the total child support obligation*, both of which are calculated correctly on the worksheet.

The error in the calculation occurs when the trial court in its Reasons for Judgment shows McCorvey's *total* obligation as a *basic* obligation, and then adds to McCorvey's total obligation of $1,198.26 from the worksheet, one-half of the insurance premium, $132.15, and one-half of the educational expense, $214.46, bringing his total monthly obligation to $1,544.87.  McCorvey has already been attributed 62.5% of each of these expenses on the worksheet.  Therefore, he should not be charged with one-half of each expense again.  Accordingly, McCorvey's monthly child support obligation, including his portion of the educational expense and the medical insurance premium, is hereby adjusted to $1,198.26, as shown on the worksheet, resulting in a downward adjustment of $346.61 per month.

### *Retroactivity of Child Support Obligation & Arrearage*

After calculating McCorvey's monthly child support obligation, the trial court ruled that the obligation was retroactive to the date of judicial demand, which was June 24, 2002 when Harden filed for divorce and child support.  The trial court then calculated an arrearage based upon the monthly obligation of $1,544.87 for the months from June 24, 2002 through December 24, 2004, gave McCorvey credit for amounts paid, and ordered him to pay $27,027.97 in delinquent child support.

McCorvey argues that there is no delinquency whatsoever.  He asserts that because he had been paying an interim child support amount of $673.00 per

month, pursuant to Judge Genovese's order of November 8, 2002, the current award by Judge McGee is a final award and is effective, not retroactively, but only as of the date Judge McGee signed the January 2005 judgment. McCorvey cites La.R.S. 9:315.21 B(1) as support for his argument against retroactivity. The statute provides in pertinent part:

> **[La.R.S. 9:]315.21. Retroactivity of child support judgment**
>
> A. Except for good cause shown, a judgment awarding, modifying, or revoking an interim child support allowance shall be retroactive to the date of judicial demand, but in no case prior to the date of judicial demand.
>
> B. (1) A judgment that initially awards or denies final child support is effective as of the date the judgment is signed and terminates an interim child support allowance as of that date.
>
> (2) If an interim child support allowance award is not in effect on the date of the judgment awarding final child support, the judgment shall be retroactive to the date of judicial demand, except for good cause shown, but in no case prior to the date of judicial demand.

Even though Judge McGee described his judgment as a "first formal" determination of child support and apparently applied provision (A) above, an interim award had been in place since 2002. The interim award does not appear to have been based upon a formal hearing or upon McCorvey's earnings in 2002. Harden had filed for a determination of final support in May 2004, and the hearing held in November and December 2004 appears to have been addressing a final award. Therefore, even though we believe that the award of $673.00 was far less than it should have been based upon McCorvey's earnings in 2002, the current award appears to be a final award, and we must apply provision (B)(1). Therefore, we reverse the portion of the judgment ruling that the award is retroactive.

*Denial of Motion to Decrease Child Support*

19

McCorvey requested a decrease in child support on May 20, 2004, alleging that the interim judgment of November 8, 2002 ordering him to pay $673.00 per month in child support should be reduced in light of the fact that his "income and actual resources had been significantly reduced." The trial court denied the motion. McCorvey argues that he established at trial that his year-to-date income for 2004 was $36,462.50 resulting in a monthly gross income of $3,038.54 based upon his cancelled checks and bank statements, and his self-generated ledgers, spreadsheets, and expense summaries presented at trial. He, therefore, argues a significant change in circumstances, that the reduction should have been granted, and that the trial court should not have assessed him with income of $7,500.00 per month and increased the child support obligation.

We have already addressed the issue of the child support obligation and affirmed the court's finding regarding the manipulated numbers and income pursuant to *Verges* and *Hudnall.* The trial court clearly found McCorvey's tax returns and any financial information prepared by him to be untrustworthy. Based upon the information that could be located, the trial court clearly believed that McCorvey manipulated the numbers. As previously indicated, the trial court was "suspicious of the testimony and the numbers submitted by McCorvey," found the testimony of the defendant to be "unworthy of belief," and found his documentation "unreliable in that it does not pass simple accounting, checks and balances, and 'smacks' of fraud and deceit." The record supports this assessment. The trial court, as the entity best situated to evaluate the evidence and testimony, has great discretion in financial matters, and we find no abuse of that discretion.

McCorvey also assigns as error the trial court's denial of his motion to expand parental custody. However, the issue of McCorvey's parental custody was decided in *McCorvey v. McCorvey*, 05-174 (La.App. 3 Cir. 11/2/05), ___ So.2d ___.

20

The current judgment appealed from does not address the child custody issue, nor shall we revisit it.

### *Partition of Community Property*

McCorvey asserts that the trial court erred in partitioning the community property with regard to various items. Accordingly, we will address the court's judgment on the items briefed by him. In general, under Louisiana law, property is characterized as either community or separate. La.Civ.Code art. 2335. Property acquired during the existence of the community is presumed to be community, but either spouse may rebut the presumption and prove the separate nature of the property. La.Civ.Code art. 2340. "The classification of property as separate or community is fixed at the time of its acquisition." *Robinson v. Robinson*, 99-3097, p. 6 (La. 1/17/01), 778 So.2d 1105, 1113.

Community property is comprised of property acquired during the existence of the legal regime through the effort, skill, or industry of either spouse; property acquired with community things or with community and separate things, unless classified as separate property; property donated to the spouses jointly; natural and civil fruits of community property; damages awarded for loss or injury to a thing belonging to the community; and all other property not classified by law as separate. *Id*. A person's separate estate is comprised, among other things, of property acquired by a spouse prior to the establishment of a community property regime and property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential in comparison with the value of the separate thing used. *Robinson*, 778 So.2d 1105.

"Former spouses continue to be co-owners of the former community property even after the termination of the community and until it has been finally

21

partitioned. La.Civ.Code. arts. 2369, 2369.1." *Ellington v. Ellington*, 36,943, p. 5 (La.App. 2 Cir. 3/18/03), 842 So.2d 1160, 1165, *writ denied*, 03-1092 (La. 6/27/03), 847 So.2d 1269. The court shall value the assets at the time of trial on the merits, determine the liabilities, and adjudicate the claims of the parties. *Id.* When the parties do not submit evidence of the current value of community assets, the trial court does not err in making its valuations based upon the evidence presented by the parties. *Id.* The trial court has broad discretion in partitioning community property. *Id.* The purpose of La.R.S. 9:2801 is to provide an occasion for the court to get a handle on the situation. It does not mean that the court is frozen by any statutory time level or particular valuation at any particular time or for any particular purpose, but simply to place a value on the assets for the purpose of accounting, allocation and adjudication. *Id.*; *Razzaghe-Ashrafi v. Razzaghe-Ashrafi*, 558 So.2d 1368 (La.App. 3 Cir. 1990).

As a threshold matter, with regard to the community property partition, the trial court stated in its Reasons for Judgment:

> Because the evidence submitted by the defendant, Derriel McCorvey, contains such an enormous amount of information fraught with inaccuracy, deceit, and downright fraud, and because of the defendant's failure to comply with the "work in progress" information, it is somewhat difficult for the Court to accurately shape the community estate as it existed on the date of its termination, namely June 24, 2002, when the suit for divorce was filed. However, the Court has structured conclusions which, in its opinion, are supported both by the evidence available to it, as well as from conclusions which it can draw from presumptions allowed by law. With this in mind, the Court will first note the community assets in the possession of each of the party litigants.

*A.    2002 Yukon XL*

The trial court valued the 2002 Yukon XL at $23,550.00, included it as a community asset in the possession of Harden, and designated the balance owed of

$19,050.36 as an obligation to be assumed by Harden. McCorvey asserts that the vehicle is the separate property of Harden and should not have been included as a community asset. The record indicates that Harden purchased the 2002 Yukon XL with McCorvey's knowledge by making a $10,000.00 down payment with community funds in April of 2002. The vehicle was titled in her name. Harden's father offered temporary help with regard to monthly payments by securing a loan in his name using the vehicle as collateral with permission of the financing institution. Pursuant to *Robinson v. Robinson*, the vehicle was acquired during the existence of the legal regime through the effort, skill, and industry of one of the spouses; it was acquired with community things and separate things; and it was not classified as separate property. Therefore, we affirm the trial court's inclusion of the Yukon XL as a community asset. Moreover, the record indicates that McCorvey drove the vehicle, insisted that it be deemed community property, and listed it in his own schedule as community property.

However, we note that the trial court allowed Harden reimbursement credit for one-half of the payments of $17,367.28 that she made on the Yukon, a vehicle that she would drive exclusively following the termination of the community. We have held that reimbursements for payments on community obligations made with separate funds after the termination of the community property regime should be denied, especially when the community asset is a vehicle. This applies as well to the reimbursement credits of $19,048.47 allowed McCorvey on the Ford Expedition. More specifically, in *Sheridon v. Sheridon*, 03-103 (La.App. 3 Cir. 2/4/04), 867 So.2d 38 (*en banc*), where the divorce suit was filed in October 1999 and the last day of trial was in November 2001, this court articulated as follows:

> Mr. Sheridon asserts that the trial court erred in requiring him to reimburse Ms. Sheridon $4,110.25, representing one half of the amounts she paid between October 5, 1999, and

November 15, 2001, on the note executed to finance the purchase of the Pontiac Firebird. In asserting this argument, he relies on this court's decisions in *Bergeron v. Bergeron*, 96-1586 (La.App. 3 Cir. 4/9/97), 693 So.2d 199, and *Preis v. Preis*, 94-442 (La.App. 3 Cir. 11/2/94), 649 So.2d 593, *writs denied*, 94-2939, 94-2942 (La. 1/27/95), 649 So.2d 392.

In *Preis*, we cited jurisprudence from the other circuits to conclude that "a spouse who has the exclusive use of an automobile following the termination of the community, is not entitled to reimbursement or credit for notes paid on it." *Preis v. Preis*, 649 So.2d at 596. *Bergeron* reached the same conclusion.

However, another panel of this court, in *Nash v. Nash*, 01-766 (La.App. 3 Cir. 10/31/01), 799 So.2d 829, *writ denied*, 01-3154 (La. 2/1/02), 808 So.2d 344, concluded that La.Civ.Code art. 2365 governed the reimbursement issue, and declined to follow this court's holdings in *Preis* and *Bergeron*. The issue is now before us *en banc* to resolve the split within this circuit on this issue. In addressing this issue, we reaffirm our decisions in *Preis* and *Bergeron*.

Louisiana Civil Code Article 2365 provides:

> If separate property of a spouse has been used to satisfy a community obligation, that spouse, upon termination of the community property regime, is entitled to reimbursement for one-half of the amount or value that the property had at the time it was used. . . .

The phrase "upon termination of the community property regime" is crucial to our interpretation of La.Civ.Code art. 2365. The Article does not say "upon partition," but specifically uses the words "upon termination." Because of the specific language used, it is clear that the reimbursement scheme contemplated by La.Civ.Code art. 2365 pertains solely to debts paid *during* the marriage, and not those paid after divorce. Thus, Ms. Sheridon would be entitled, under La.Civ.Code art. 2365, to reimbursement for community debts she paid with separate funds *before* termination of the marriage. As such, La.Civ.Code art. 2365 is not applicable to the matter before us, and we specifically overrule this holding in *Nash*.

In doing so, we conclude that the trial court erred in ordering Mr. Sheridon to reimburse Ms. Sheridon one half of the amount she paid on the Pontiac Firebird between October 5, 1999, and November 15, 2001. Thus, we find merit in this assignment of error.

*Sheridon*, 867 So.2d at 44.

Based upon the above, reimbursements do not apply to community obligations paid with separate funds after the termination of the community property regime. Since all reimbursements allowed by the trial court are under the heading of "Reimbursements Due the Parties Litigant for the Payment of Community Obligations after the Filing of the Suit for Divorce," the judgment shall be amended to delete all reimbursements listed for both parties. The deleted reimbursements are $28,993.50 for Harden and $22,404.62 for McCorvey.

B.    *1996 Ford Taurus*

It is uncontested that the Ford Taurus was purchased during the marriage with community funds. Harden, with McCorvey's knowledge, donated the vehicle to a cousin in college on May 28, 2002. The record indicates reluctant concurrence by McCorvey. The trial court valued the vehicle at the time of trial, apparently at NADA average retail book value of $5,252.00. McCorvey asserts that the vehicle should have been valued at the earlier time of the donation, and that he is entitled to reimbursement of one-half of the value of the vehicle. "The donation of community property to a third person requires the concurrence of the spouses, but a spouse acting alone may make a usual or customary gift of a value commensurate with the economic position of the spouses at the time of the donation." La.Civ.Code art. 2349.

While the gift of the vehicle worth $5,252.00 may have not been usual or customary, its value is commensurate with the economic position of the parties who are both practicing attorneys. McCorvey also reluctantly concurred in the

donation, such that Harden was not acting alone. The 1996 Ford Taurus was not included by the trial court as a community asset or liability in the possession of either party. We find no abuse of discretion in the trial court's omission of the vehicle in the partition, or in the court's evaluation of the vehicle at the time of trial, which was proper pursuant to *Ellington,* 842 So.2d 1160.

### C.     2002 Tax Liability

Harden filed for divorce on June 24, 2002, and the judgment of divorce was granted on November 21, 2002. Harden testified that she was aware of McCorvey's under-reporting of his income in 2001, and her accountant advised her not to file a joint return in 2002. Accordingly, the parties filed separate tax returns on their 2002 income. McCorvey argues that the parties incurred a tax liability in 2002 of $53,460.00 plus a penalty of $8,440.11 and interest of $1,572.74 for a total liability in 2002 of $63,472.85. The trial court determined that the basic tax liability for purposes of the community property partition was a community liability, but that the penalty and interest were not. McCorvey asserts that the entire amount is a community obligation, including the penalty and interest, and that the trial court erred in not including it. He further asserts that he paid $13,077.00 toward the tax liability after Harden filed for divorce and should be reimbursed the full $13,077.00. McCorvey is not entitled to a full reimbursement of the $13,077.00.

Pursuant to La.Civ.Code art. 2365, if separate property of a spouse has been used to satisfy a community obligation, the spouse, upon termination of the community property regime, is entitled to reimbursement for only one-half of the amount expended. See *Sellers v. Landry*, 489 So.2d 440 (La.App. 3 Cir. 1986). Moreover, as articulated above, we have held that reimbursement of one-half of separate funds paid on community obligations under Article 2365 applies only to

payments made from separate funds during the community property regime, not after the termination of the community property regime. *Sheridon*, 867 So.2d 38. Accordingly, the trial court did not err in failing to reimburse McCorvey for any portion of the $13,077.00 that he paid toward the tax liability.

With regard to whether a tax deficiency is a community obligation where the parties divorced and filed separate returns in the year of the deficiency, we turn to *Munson v. Munson,* 00-348 (La.App. 3 Cir. 10/4/00), 772 So.2d 141. There, the parties had filed separate returns in the same year that they were divorced, and this court affirmed the trial court's denial of Mr. Munson's claim that he was entitled to a reimbursement of one-half of the $1,945.66 tax deficiency which he paid with separate funds. Munson argued that a community property presumption attached to the tax deficiency and that a stipulation which the parties entered into regarding the amount of the paid deficiency conclusively established its community property nature. In *Munson*, this court articulated its reasoning as follows:

> Mr. Munson does not dispute the fact that the parties filed separate tax returns for the 1994 tax period. Further, the stipulation to which he refers merely provides that he "paid the sum of $1,945.66 for income taxes [sic] for the calender year 1994; however, SUSAN MUNSON, reserves the right to contest the right of LAWRENCE MUNSON to a credit or reimbursement of that amount. . . ." When reaching its decision, the trial court simply found that "[w]ithout more evidence regarding the reasons for the assessment, Mr. Munson has presented insufficient evidence to prove that the deficiency was a community obligation." In other words, Mr. Munson failed to prove that the community property, not him separately, incurred the tax deficiency. We agree with the trial court and affirm its decision on this issue.

*Munson,* 772 So.2d at 146.

However, in addressing the tax liability in this case, the trial court stated:

> [A]s it relates to the 2002 tax liability of the defendant, the Court recognizes that the plaintiff did not execute the tax return and therefore she may have no responsibility to the

Government relative thereto. However, the fact remains that since the defendant must respond to the community for much of the income, it is only appropriate that the community be responsible for the tax liability. At the same time, however, the Court is of the opinion that this is a problem created by the defendant and therefore the community should not be responsible for interest and penalties. That having been said, the Court took the taxes owed and subtracted the payments made resulting in the appropriate balance due by the community of $46,001.00.

The trial court reasoned that McCorvey's 2002 income would be subject to the community, and therefore the tax liability generated by the income would also be a community obligation. We will not disturb the trial court's determination that the 2002 tax liability is a community obligation. The reason for the penalty of $8,440.11 and interest of $1,572.74 is not clear. The record reveals that McCorvey did not sign his tax return for 2002 until November 6, 2003, and that he underestimated the taxes owed in the report. It is, therefore, assumed that at the least, the tax return was delinquent. Harden cannot be held responsible for the penalty and interest assessed against McCorvey, where McCorvey could have filed timely and arranged for payment to the IRS via monthly installments.

We note that the basic 2002 tax liability is $53,460.00 as shown on the IRS Request for Payment in the record, and that the payment of $13,077.00 results in a balance of $40,383.00, prior to the addition of the penalty and interest, not $46,001.00 as indicated by the trial court. Therefore, the judgment of partition, which allocates the tax liability to McCorvey, shall be amended to allocate $40,383.00 as a community liability in the possession of McCorvey.

D.    *McCorvey's Attorney Fees*

Louisiana Civil Code Article 2357 provides that attorney fees incurred by a spouse in a divorce action, between the date the petition for divorce was filed and the date of the judgment of divorce, may be satisfied from the property of the

former community and from the separate property of the spouse who incurred the obligation. In the present case, both Harden and McCorvey are practicing attorneys. McCorvey has represented himself in both the trial court and this appellate court on numerous occasions. Harden has submitted attorney fees in the amount of $15,588.10, which the trial court found to be reasonable. McCorvey, alleging the services of three attorneys, besides himself, submitted fees in the amount of $55,293.13, which the trial court found to be unreasonable and not an "honest number." The trial court reviewed the record and determined that some of the contracts and statements submitted by McCorvey were ambiguous with regard to dates, amounts and services. The only bill that the trial court was able to satisfactorily calculate for services performed between the filing of divorce on June 24, 2002 until the granting of divorce on November 21, 2002 was a bill showing 62.5 hours at a rate of $175.00 per hour plus expenses of $253.84. The trial court, therefore, calculated that bill supportable in the amount of $11,191.34.

Two other contracts submitted by McCorvey for $25,000.00 each, one of which refunded approximately $10,000.00, were problematic or unsupported in the trial court's view, because they were not properly dated and/or contained no itemized services. The court determined that it was only required to designate "reasonable" attorney fees as an obligation of the community. Finding Harden's submission of $15,588.10 reasonable, the trial court allowed McCorvey the same amount, and considered the attorney fees as to each party a "wash out." We affirm.

E.    *Office Furniture*

McCorvey complains that the trial court designated $2,701.63 as the value of community-owned office furnishings in the possession of Harden. He asserts that Harden actually spent $17,703.71 on office furnishings, with $12,511.93 spent

at one furniture store. Without specifically addressing other variances, McCorvey alleges that this community asset in Harden's possession should be valued at $17,703.71. Harden asserts that the $12,511.93 purchase was made in 2001 from legal fees earned by her during the community property regime; that the purchase was made in McCorvey's presence and with his participation; that the furnishings were actually dining room furnishings and were the subject of an Act of Exchange in October of 2002, wherein both parties agreed on the voluntary division of specific movable assets. The cancelled checks and Act of Exchange that are the subject of this dispute were entered into the record as exhibits.

In the area of domestic relations, much discretion is vested in the trial judge and particularly in evaluating the weight of evidence which is to be resolved primarily on the basis of the credibility of witnesses. The trial judge having observed the demeanor of the witnesses is in the better position to rule on their credibility. *Trosclair v. Trosclair*, 337 So.2d 1216 (La.App. 1 Cir.1976). The factual findings of the trial court are therefore to be accorded very substantial weight on review. *Gilberti v. Gilberti*, 338 So.2d 971 (La.App. 4 Cir.1976); *Pearce v. Pearce*, 348 So.2d 75, 78 (La.1977); *Sander v. Brousseau*, 00-0098 (La.App. 4 Cir. 10/4/00), 772 So.2d 709. Accordingly, we affirm the trial court's judgment on this issue.

*F.    MBNA and Citibank Credit Card Accounts*

Louisiana Civil Code Article 2360 provides: "An obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation." The trial court determined that the MBNA credit card account was community property, designated its balance of $9,499.22 as an obligation to be assumed by Harden, and reimbursed one-half of $4,747.00 to Harden for payments that she made after the termination of the community property regime. McCorvey complains that the account is in Harden's name and contains charges incurred before the marriage. Harden asserts that the account is old, that she does not believe any charges on it pre-date the marriage, and that the card was used when they were first married to pay for their first apartment, bills, groceries, clothes for McCorvey, and trips they took together, including a trip to New York. The parties were married in 1993, and receipts were not available. Therefore, the trial court made credibility determinations which we will not disturb. We affirm the inclusion of the MBNA credit card as a community obligation in the possession of Harden. However, as previously discussed, the credit for reimbursement has been deleted.

With regard to the Citibank credit card account, the trial court included it as a community obligation in possession of Harden in the amount of $2,910.50 and reimbursed her one-half of the $3,020.70 in payments that she made after the termination of the community. As indicated above, the credit for reimbursement is deleted. McCorvey asserts that the trial court stated at trial that it would not honor claims made by Harden as to the Citibank account. The record reflects the trial court's statement, "I'm not going to honor any claim that she's made for it," and Harden does not contest the issue in her brief. Therefore, the partition judgment will

31

be amended to delete the Citibank credit card account as a community liability of $2,910.50 in possession of Harden.

G.    *$275,000.00 of Unreported Income*

The trial court allocated $275,000.00 for work in progress *and* unreported income as a community asset in the possession of McCorvey at the time of the dissolution of the community property regime, June 24, 2002. As indicated above, the trial court did not abuse its discretion in finding McCorvey in contempt for his refusal to submit the work-in-progress, for choosing to go on an elk hunt instead, and for bouncing the $5,000.00 check he was ordered to supply as payment for a court expert to evaluate his files. Part of McCorvey's punishment was that the trial court would disregard any evidence submitted by him with regard to work-in-progress, which we have also affirmed.

McCorvey asserts that the unreported income allegation pertained to the year 2001, that the 2001 income was used by the community in 2001, and this had nothing to do with the community partition in 2002. We disagree. The work in progress and unreported income was shown by the trial court as an *asset in McCorvey's possession* as of the termination of the community in June 2002. The trial court did not break down which portion of the $275,000.00 was unreported income and which portion was work-in-progress. Nor did it specify whether the unreported income still in McCorvey's possession was from 2001 or 2002 or both. However, the record supports a finding of this amount as reasonable under the circumstances.

More specifically, Harden testified that McCorvey's records showed income of over $194,000.00, with net income of over $163,000.00 in 2001, and that she was completely unaware of this income because McCorvey's tax return showed

gross income of $44,111.00 and net income of $12,058.00. She testified that the parties maintained separate bank accounts, paid the various community obligations separately, and did not pool their money. Harden further stated that she used the bulk of her salary to pay certain obligations, that McCorvey paid others, and that he had free reign of his surplus. Therefore, it is reasonable to conclude that there were community assets in the possession of McCorvey in 2002 as a result of his unreported income in 2001. Likewise, the 2001 criminal contracts represent possible work-in-progress that would carry over into 2002 if not received in 2001 as maintained by McCorvey.

As for the 2002 income, McCorvey has admitted that he does not always give receipts for cash payments "unless the client" requests a receipt; he did not deny or confirm that he deposited all income; and, he admitted at trial that both his 2001 and 2002 returns are "apparently" in error. His 2002 return shows gross receipts of $258,452.00 and adjusted income after expenses and deductions of $153,776.00. However, Harden asserts, and the record provides a reasonable basis for the trial court to consider, that McCorvey had unreported income in 2002 as well, and work-in-progress in the form of some of the criminal contracts, which Harden calculated at $82,200.00.

Based upon McCorvey's pattern of under-reporting his income, his admissions regarding the unrecorded receipt of cash payments, his evasive responses regarding whether he deposited all funds received, his admissions as to erroneous returns in 2001 and 2002, his behavior at the intake conference, and his failure to provide "work-in-progress" information ordered by the court, we do not find an abuse of discretion in the trial court's finding of $275,000.00 as an asset in McCorvey's possession resulting from unreported income *and* work-in-progress. We note that in the partition, Harden is being held responsible along with McCorvey for a tax liability

33

of $40,383.00 incurred by McCorvey in 2002, and she, therefore, should receive the full benefit of his income and work-in-progress.

H.    *Harden's Income from January 1, 2002 through June 24, 2002*

McCorvey argues that in partitioning the community assets, the trial court failed to include Harden's 2002 earnings up to June 24, 2002, when the community was terminated, and failed to include attorney fees that she received after June 24 for work done during the marriage.  He asserts that by July 2002, Harden had made $83,669.69 in legal fees, and that he introduced evidence of $21,740.88 received by Harden after June 24 for work done during the marriage.  McCorvey thus asserts that the trial court failed to include $105,410.57 of Harden's earnings in 2002 in partitioning the community assets.  We conclude that this is not a true representation of Harden's income.

Harden is employed by the district attorney's office.  The $83,669.69, shown on her ledger as 2002 income and described by McCorvey as "legal fees" actually breaks down as follows:  the amounts of $16,153.90 and $4,804.70, respectively, are employee income from the district attorney's office and a supplement from the Police Jury received monthly from January through July of 2002; the amount of $31,561.09 represents a list of fees on various private clients with no discernible indication of the months received; and the amount of $31,150.00 represents a list of fees received by one client with a monthly breakdown from January through August, indicating that fees are paid as earned.  Therefore, by our calculation, the monthly earnings after June 2002, from the district attorney's office, Police Jury, and the client who pays monthly, amount to a total of $10,894.09 and should not be included as income earned during the community property regime.

34

This reduces McCorvey's assertion of income for Harden to $72,775.60 through June of 2002.

However, the raw earnings of Harden do not equate to an asset in her possession at the time of the dissolution of the community, just as the raw earnings of McCorvey do not appear as an asset listed by the court. What we do find is that, while the trial court attributed McCorvey with a bank balance of $119,078.47 as an asset on June 24, 2002, there was no corresponding asset listed for Harden. The record indicates that her savings account had a zero balance on June 20, 2002, and that her checking account had a balance of $169.60 on June 10, 2002, and slightly less on June 30. Accordingly, the amount of $169.60 will be added to the list of community assets in Harden's possession on June 24, 2002.

We note that the record indicates that Harden had one other checking account in 2002, an IOLTA client trust account, with a balance of $73,984.45 on June 13, 2002. Likewise, McCorvey had a client trust account with a balance of $20,375.96 on June 24, 2002. Neither of these accounts was listed by the trial court as a community asset as these funds are assumed to belong to the clients, not the attorneys.

Now we turn to the $21,740.88 claimed by McCorvey as additional income to Harden which she received after the dissolution of the community property regime but earned during the regime. Our review of the record confirms McCorvey's assertion. Harden answered interrogatories regarding income earned prior to June 24, 2002 but received after that date by providing a list of fees with dates earned and dates received. The total of her listed fees, which constitute work-in-progress on June 24, 2002, is $21,740.88. In the section on assets in the possession of Harden, the trial court lists her office furnishings as having a value of $2,701.63, and also lists her work-in-progress as having a value of $2,701.63. We believe that the trial court

35

inadvertently listed both assets at the same amount. The work-in-progress asset in the possession of Harden will be adjusted to reflect the proper amount of $21,740.88.

### *Assessment of Court Costs*

McCorvey asserts in one very brief paragraph that the trial court erred in assessing 90% of the court costs to him and that the assessment advances the assumption that McCorvey "was solely responsible for the costs of these complex domestic proceedings." He argues that the parties should share the costs equally. We point out that, relatively speaking, these particular domestic proceedings are not "complex" in that there are not significantly complex or novel issues at stake. We imagine that Donald Trump's divorces and property partitions have been "complex domestic proceedings" but note that, contrary to McCorvey's assertions, the complexities in this litigation, where there is no real property whatsoever to partition, are likely due to his own machinations, and that he is indeed responsible for the Kafkaesque labyrinth we now traverse.

Harden argues that under La.Code Civ.P. art 1920, "the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." She further states that given the tenor of the judgment against McCorvey, coupled with his "contemptuous history and dilatory tactics," the allocation of costs was proper and supported by the totality of the record. We agree and affirm.

### *Motion for Contempt Regarding Appellate Brief*

Harden has filed a Motion For Contempt and for Sanctions with this court alleging that McCorvey has violated Rule 2-12.4 of the Uniform Rules of the Courts of Appeal and should be sanctioned by having his brief returned to him. Rule 2-12.4 provides that the language used in an appellate brief should be free from insulting matter or criticism of any court, judge, or institution, and that the penalty for

violating the rule is the return of the offender's brief. Harden points to two pages in McCorvey's brief wherein he accuses the trial courts of treating him unfairly, and criticizes the trial judge's comments in his Reasons for Judgement as "nothing more than a shallow attempt to distract from an otherwise suspect partition and setting of final support."

We believe that McCorvey's language is accusatory and critical of the trial court and the judges, and that the criticism is unfounded and unsubstantiated by the trial record pursuant to *United States v. Brown*, 72 F.3d 25 (5th Cir. 1995), particularly in light of McCorvey's repeated contemptuous behavior before those judges. As Harden points out, McCorvey has been found in contempt four or five times, has violated injunctions and court orders with regard to community funds and assets, child custody issues, and discovery. We have studied the transcripts and records on the various appeals that he has brought before us, and we have affirmed all findings of contempt against him and all sanctions imposed by the trial courts.

We have also noted in his arguments the carefully phrased half-truths with regard to certain issues, including the disposition of his income, wherein he repeatedly stated that it is his "practice" to record or deposit funds, without stating specifically that he did or did not do so in a given instance. This kind of veiled innuendo is not escaping the courts, and we note how his behavior has undermined his credibility throughout this litigation. Notwithstanding, we have done the work of studying his appeal. In the interest of judicial economy, we prefer to dispose of the issues in it in order to avoid the repetitive work that would occur when he re-filed. However, we wish to issue a warning to McCorvey. Should any other of his appeals be accompanied with a motion to this court to return his brief for a violation of the rules of appellate courts, that motion will be reviewed first. If the slightest grounds

exist, the offending brief will be returned in short order, and all other allowable sanctions will be imposed.

IV.

## CONCLUSION

Based upon the foregoing, we affirm the trial court's judgment in part, affirm in part with modifications and amendments, and reverse in part as follows:

All credits for reimbursements to the parties for community obligations paid after June 24, 2002 shall be deleted;

The tax liability shown as a community obligation in the possession of McCorvey is adjusted from $46,001.00 to the correct balance of $40,383.00;

The Citibank credit card balance of $2,910.50, shown as a community obligation in the possession of Harden will be deleted;

Community assets in the possession of Harden will be amended to reflect an additional asset of a bank account balance of $169.60; and the work-in-progress asset of Harden will be amended to delete the incorrect amount of $2,701.63 and add the correct amount of $21,740.88;

The total equalizing payment from McCorvey to Harden based upon the above amendments is hereby adjusted downward from $215,218.51 to $203,673.39;

McCorvey's total monthly child support obligation is adjusted downward from $1,544.87 to $1,198.26. McCorvey is to be credited with any overpayments made thus far, if any;

We reverse the portion of the award regarding retroactivity of the payments resulting in the arrearage of $27,027.97;

The trial court judgment is affirmed in all other respects.

38

Ninety percent of the costs of this appeal are assessed to McCorvey and ten percent to Harden.

**AFFIRMED IN PART; MODIFIED AND AMENDED IN PART; REVERSED IN PART**.